UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEROME A. HALE,

        Petitioner,

                                  CASE NO. 2:07-CV-12397

  v.                            JUDGE VICTORIA A. ROBERTS

                                  MAGISTRATE JUDGE PAUL J. KOMIVES

BARRY D. DAVIS,

        Respondent.[1]

_____/

## REPORT AND RECOMMENDATION

I.     RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
II.    REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
    A.     *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
    B.     *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . .  7
    C.     *Procedural Default* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12
        1.     *Procedural Default Generally* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12
        2.     *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
             a. Claims Raised on Direct Appeal (Claims I & II) . . . . . . . . . . . . . . . . . . . . . . . . . .  13
             b. Claims Raised in First Motion for Relief from Judgment (Claims III-IX) . . . . . . . .  14
             c. Claims Raised in Second Motion for Relief from Judgment (Claims X-XII) . . . . . .  15
    D.     *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16
    E.     *Jury Voir Dire (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18
        1.     *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19
        2.     *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20
    F.     *Sufficiency of the Evidence (Claim IV)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22
        1.     *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22
        2.     *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25
    G.     *Suggestive Line-Up (Claim V)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26
        1.     *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27
        2.     *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28
    H.     *Prosecutorial Misconduct (Claims VI & VII)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31
        1.     *Compensation for Testimony* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31
        2.     *Vouching for Witnesses* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34
             a. Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35
             b. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35
    I.     *Ineffective Assistance of Counsel (Claims II-III, & IX)* . . . . . . . . . . . . . . . . . . . . . . . . . .  36
        1.     *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37
        2.     *Trial Counsel* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38
             a. Failure to Call Alibi Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38
             b. Failure to Object . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40
             c. Redaction of Maxwell's Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

---

[1]By Order entered this date, Barry D. Davis has been substituted in place of Carol Howes as the proper respondent in this action.

          3.       *Appellate Counsel* ...................................................... 42
     J.      *Cumulative Error (Claim VIII)* ............................................... 42
     K.      *Conclusion* ........................................................... 43
III.      <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u> ..................................... 43

*        *        *        *        *

I.       <u>RECOMMENDATION</u>: The Court should deny petitioner's application for the writ of habeas corpus.

II.      <u>REPORT</u>:

A.       *Procedural History*

1.       Petitioner Jerome A. Hale is a state prisoner, currently confined at the Newberry Correctional Facility in Newberry, Michigan.

2.       On February 1, 2001, petitioner was convicted of felony murder, Mich. Comp. Laws § 750.316(1)(b); and possession of a firearm during the commission of felony, Mich. Comp. Laws § 750.227b, following a jury trial in the Wayne County Circuit Court. On March 8, 2001, he was sentenced to a mandatory term of life imprisonment without parole on the murder conviction, and to a mandatory consecutive term of two years' imprisonment on the felony-firearm conviction.

3.       Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I.       THE TRIAL COURT'S NEGATIVE AND HOSTILE RESPONSES TO JURORS WHO EXPRESSED AN INABILITY TO BE FAIR UNDERMINED THE EFFECTIVENESS OF VOIR DIRE AND VIOLATED DEFENDANT'S RIGHTS TO AN IMPARTIAL JURY AND A FAIR TRIAL.

II.      DEFENDANT'S CONVICTIONS MUST BE REVERSED AND DISMISSED WHERE HE WAS DENIED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHT TO A SPEEDY TRIAL WHEN HE WAS NOT BROUGHT TO TRIAL UNTIL SEVEN MONTHS AFTER HIS ARREST.

2

> III.   DEFENDANT WAS DENIED HIS STATE AND FEDERAL
> CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF
> COUNSEL.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence. *See People v. Hale*, No. 234038, 2002 WL 31953819 (Mich. Ct. App. Dec. 13, 2002) (per curiam).

4.    Petitioner sought leave to appeal these issues to the Michigan Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Hale*, 469 Mich. 861, 666 N.W.2d 670 (2003).

5.    Petitioner next filed a motion for reversal of his conviction, apparently raising jurisdictional claims relating to the warrant, complaint, and bind-over. The trial court denied the motion on June 15, 2004.

6.    Petitioner subsequently filed a motion for relief from judgment in the trial court pursuant to MICH. CT. R. 6.500-.508, ultimately raising in his initial and an amended motion the following claims:

> I.    DEFENDANT WAS DENIED HIS STATE AND FEDERAL
> CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF
> TRIAL COUNSEL WHERE TRIAL COUNSEL FAILED TO CALL AND
> PRESENT AN AVAILABLE "ALIBI" WITNESS AND DEFENSE, AND
> FAILED TO OBJECT TO IMPROPER PROSECUTORIAL COMMENTS,
> AND COUNSEL'S FAILURE TO OBJECT TO INTRODUCTION OF
> "REDACTED" PRELIMINARY EXAMINATION TESTIMONY OF AN
> UNAVAILABLE WITNESS.

> II.   DEFENDANT WAS DENIED HIS STATE AND FEDERAL
> CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW WHERE THE
> STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO
> CONVINCE A "RATIONAL TRIER OF FACT" OF PROOF BEYOND A
> REASONABLE DOUBT OF EACH ESSENTIAL ELEMENT OF THE
> CHARGED OFFENSE NECESSARY TO CONVICT.

> III.  DEFENDANT WAS DENIED DUE PROCESS OF LAW AND A FAIR
> TRIAL WHERE DEFENDANT WAS CONVICTED ON THE BASIS OF

3

> AN UNNECESSARILY SUGGESTIVE PRE-TRIAL LINEUP WHICH WAS CONDUCIVE TO IRREPARABLE MISTAKEN IDENTIFICATION.
>
> IV.   DEFENDANT WAS DENIED DUE PROCESS OF LAW AND A FAIR TRIAL WHERE THE PROSECUTION KNOWINGLY VIOLATED BOTH STATE AND FEDERAL STATUTES AND THE RULES OF PROFESSIONAL CONDUCT WHEN THE PROSECUTOR "PURCHASED" THE TESTIMONY IN ADVANCE OF TRIAL OF TODD RICHARDSON THEREBY TAINTING THE ENTIRE PROCEEDINGS WITH FUNDAMENTAL UNFAIRNESS.
>
> V.   DEFENDANT WAS DENIED DUE PROCESS OF LAW AND A FAIR TRIAL WHERE THE PROSECUTOR "VOUCHED FOR AND BOLSTERED" THE TESTIMONY OF THE STATE'S WITNESS.
>
> VI.   DEFENDANT WAS DENIED A FAIR TRIAL DUE TO THE CUMULATIVE EFFECT OF THE PREJUDICIAL ERRORS DURING HIS TRIAL.
>
> VII.   DEFENDANT HALE'S SENTENCES FOR MANDATORY NON-PAROLABLE LIFE FOR FIRST DEGREE FELONY MURDER AND FELONY FIREARM VIOLATE BOTH THE STATE AND FEDERAL CONSTITUTIONAL GUARANTEES AGAINST CRUEL AND UNUSUAL PUNISHMENT, AND THE MICHIGAN CONSTITUTION BECAUSE THEY ARE "DETERMINATE" SENTENCES.
>
> VIII.   DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL ON HIS DIRECT APPEAL AS OF RIGHT WHERE HIS APPELLATE ATTORNEY DID NOT RAISE THE ATTACHED ISSUES IN HIS BRIEF IN SUPPORT OF HIS MOTION FOR RELIEF FROM JUDGMENT AND FAILED TO ADEQUATELY FEDERALIZE HIS ISSUES IN HIS DIRECT APPEAL AS OF RIGHT.

On April 26, 2005, the trial court denied petitioner's motion for relief from judgment, concluding that petitioner's claims were without merit and that petitioner had failed to establish good cause for his failure to raise the claims on direct appeal, as required by MICH. CT. R. 6.508(D)(3). *See People v. Hale*, No. 00-008301-01 (Wayne County, Mich., Cir. Ct. Apr. 26, 2005). Petitioner filed an application for leave to appeal in the Michigan Court of Appeals, raising the eight claims raised in his motion plus two additional claims challenging the trial court's handling of his motion. The

4

Michigan Court of Appeals initially dismissed petitioner's application for leave to appeal, concluding that in light of the previously filed motion for reversal of conviction, petitioner's motion for relief from judgment was a successive motion prohibited by MICH. CT. R. 6.502(G); however the court of appeals permitted petitioner's appeal from his motion for reversal of conviction to proceed. *See People v. Hale*, No. 263293 (Mich. Ct. App. June 30, 2005). Acting on petitioner's application for leave to appeal, the Michigan Supreme Court remanded the matter to the court of appeals to consider petitioner's application for leave to appeal to the court of appeals, concluding that petitioner's motion for relief from judgment, as the first filed motion, was not a prohibited second motion under Rule 6.502(G). *See People v. Hale*, 474 Mich. 930, 706 N.W.2d 19 (2005). On February 10, 2006, the court of appeals denied petitioner's application for leave to appeal based on petitioner's "failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Hale*, No. 263293 (Mich. Ct. App. Feb. 10, 2006). The Michigan Supreme Court subsequently denied petitioner's application for leave to appeal for the same reason. *See People v. Hale*, 476 Mich. 864, 720 N.W.2d 304 (2006).

7.    Petitioner filed a motion for new trial in the trial court, raising three claims:

I.    THE TRIAL COURT PREJUDICIALLY DEPRIVED DEFENDANT OF HIS RIGHT TO COUNSEL PROVIDED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION, AS DETERMINED BY CLEARLY ESTABLISHED UNITED STATES SUPREME COURT PRECEDENTS, WHEN THE TRIAL COURT FAILED TO SUMMON DEFENSE COUNSEL TO APPEAR IN OPEN COURT REGARDING SIGNIFICANT REQUESTS FROM DEFENDANT'S DELIBERATING JURY FOR INFORMATION NEEDED FOR JURY DELIBERATION.

II.   DEFENDANT WAS PREJUDICIALLY DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL PROVIDED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION, AS DETERMINED BY CLEARLY ESTABLISHED UNITED STATES SUPREME COURT PRECEDENT, WHERE THAT ATTORNEY

5

DEMONSTRATED EGREGIOUSLY DEFICIENT PERFORMANCE BY HAVING FAILED TO SEEK A MISTRIAL BECAUSE OF, THE TRIAL COURT HAVING COMMITTED 'PLAIN ERROR' IN HAVING DENIED DEFENDANT ATTORNEY REPRESENTATION OVER A TWO DAY PERIOD WHEN DEFENDANT'S DELIBERATING JURY TWICE REQUESTED SIGNIFICANT DELIBERATING-ASSISTING INFORMATION FROM THE TRIAL COURT.

III.   DEFENDANT WAS PREJUDICIALLY DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL PROVIDED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION, AS DETERMINED BY CLEARLY ESTABLISHED UNITED STATES SUPREME COURT PRECEDENT, WHEN THAT ATTORNEY EXERCISED DEFICIENT PERFORMANCE BY NOT HAVING RAISED, ON DEFENDANT'S DIRECT APPEAL, THE ARGUABLY TENABLE GROUNDS FOR RELIEF SET FORTH UNDER ARGUMENTS ONE AND TWO HEREIN.

On April 24, 2007, the trial court denied the motion, concluding that petitioner's claims were without merit and should have been raised on direct appeal. *See People v. Hale*, No. 00-8301-01 (Wayne County, Mich., Cir. Ct. Apr. 24, 2007).  On September 13, 2007, the Michigan Court of Appeals dismissed petitioner's application for leave to appeal, concluding that petitioner's motion for new trial was a successive motion for relief from judgment prohibited by Rule 6.502(G).  *See People v. Hale*, No. 279956 (Mich. Ct. App. Sept. 13, 2007).  The Michigan Supreme Court likewise denied petitioner's application for leave to appeal in that court, concluding that petitioner's "motion for relief from judgment is prohibited by MCR 6.502(G)."  *People v. Hale*, 480 Mich. 1009, 743 N.W.2d 20 (2008).

8.   Meanwhile, petitioner filed the instant application for a writ of habeas corpus on June 5, 2007.  As grounds for the writ of habeas corpus, his initial application raises the ten claims that he raised on appeal in connection with his first motion for relief from judgment.  Petitioner subsequently filed a motion to amend the petition to add the three claims raised in his second motion

for relief from judgment, and a motion to strike state law claims.  The Court granted both motions on July 23, 2008, specifically striking petitioner's claims I, II, and X, each of which challenged the trial court's handling of his first motion for relief from judgment.

9.      Respondent filed his answer on March 4, 2008, prior to the court's ruling on petitioner's motions to strike and to amend.  He contends that petitioner's now-stricken claims are noncognizable state law claims, and that petitioner's remaining claims are barred by petitioner's procedural default in the state courts.

10.     Petitioner filed a reply to respondent's answer on March 19, 2008.  As set forth in his reply brief, petitioner asserts twelve grounds for relief: (1) the first two claims raised on direct appeal (Claims I-II here); (2) the claims raised in his first motion for relief from judgment, with the exception of his claim challenging his sentence (Claims III-IX); and (3) the three claims raised in his second motion for relief from judgment (Claims X-XII).  Petitioner's reply asserts that these are the only grounds for relief presented by his habeas action.  Although the claims have been numbered differently throughout the complex history of this case, based on petitioner's reply and for clarity this Report addresses the claims as numbered and set forth in petitioner's reply.

B.      *Factual Background Underlying Petitioner's Conviction*

The evidence adduced at trial was accurately summarized in petitioner's brief in the Michigan Court of Appeals:

> The instant offense involved the shooting death of Amondo Triplett in the yard of Todd Richardson's house at 20230 Irvington Street in Detroit on January 17, 1999 about 10:00 a.m., as he was leaving with William Maxwell to purchase a kilo of cocaine at a coney island restaurant on Gratiot Avenue.  The prosecution alleged that Mr. Hale shot Mr. Triplett after taking his money.  The defense maintained that the prosecution's main witness, Todd Richardson, was lying in exchange for a promise by federal authorities to reduce his federal prison sentence of 292 months by half in exchange for his testimony and a conviction of Mr. Hale.

7

On the first day of trial, the prosecutor advised the trial judge that one of two eyewitnesses, William Maxwell, had been killed in Flint during the weekend preceding trial. The prosecutor's request to use his preliminary examination testimony was granted (T 1/29/01, 3-6, 156; T 1/30/01, 159-161). The parties agreed that the references to a polygraph were to be redacted. Defense counsel also insisted that any references to lineups should be redacted. The prosecutor agreed (T 1/30/01, 85-94). Defense counsel's request that the jury not be informed that the witness was killed on the Saturday prior to Defendant's trial was granted (T 1/30/01, 93).

During voir dire, four prospective jurors indicated that they had certain concerns about serving on the jury. The trial judge responded by arguing at length with the jurors (T 1/29/01, 38-96).

Officer Louis Francis, an evidence technician, testified that he photographed the scene at 20230 Irvington Street. He identified Exhibits 1-4 as photographs of the inside and outside of the house. He identified Exhibit 5 as a scene sketch, which included footprints in the snow which went from the rear of the house to the fence on the west side of the property (T 1/29/01, 142-147). On cross-examination, Officer Francis testified that there were green plastic horizontal blinds on all the windows (T 1/29/01, 150).

The prosecution's only living alleged eyewitness was Todd Richardson. He admitted that he had been indicted on federal charges of conspiracy and distribution of narcotics. He pleaded guilty in August 1999, and was sentenced on June 6, 2000 to serve 292 months. However, the federal authorities promised to cut his sentence in half if Richardson testified against Hale and Hale was convicted (T 1/30/01, 6-8, 37-39, 48-49).

In January 1999, Richardson was trafficking in narcotics. He testified that on two or three occasions, Defendant Hale fronted him some cocaine. Richardson admitted that at the time of the instant offense, he owed Hale $50,000, which he never paid (T 1/30/01, 10, 15, 39-40).

Richardson testified that he lived on Irvington Street with a roommate, Maurice Pugh ("Reese") (T 1/30/01, 10-12). On January 17, 1999, between 8 a.m. and 10 a.m., Richardson received a phone call from Amondo Triplett. He testified that about 2-3 minutes after the phone call, Hale arrived at Richardson's house. Richardson asked if Hale could get him a kilo because "Mondo was coming down to do a drug deal." Hale said no. Richardson testified that a kilo of cocaine was going for $28,000 to $30,000 at that time. They also allegedly discussed the $50,000 that Richardson owed him for "kilos on consignment." Richardson said he would give Hale the money later on, as Richardson was going to get the money on the streets from people who owed him. Hale allegedly said okay. Before Hale left, Richardson told him that Mondo was coming down to get a kilo, and Hale allegedly said, "don't worry about it, he'll get the money himself." Richardson claimed that he told Hale not to shoot Triplett. Richardson said that Hale then left out of the side door of the house (T 1/30/01, 12-17, 25-26).

Richardson testified that about 5-10 minutes after Hale left, Amondo Triplett and William Maxwell arrived at the house. Richardson had known Triplett for ten

8

years, but he had just met Maxwell two weeks prior when he and Triplett came down from Flint. After Triplett and Maxwell were there about a minute or so, Reese left. Richardson, Triplett and Maxwell smoked a joint, and Richardson gave them directions to Gratiot and Six Mile Road. Richardson also tried to sell them a bag of weed, but they didn't buy any. After Triplett made a phone call "to a Jamaican guy," he and Maxwell left out of the side door (T 1/30/01, 13, 19-24).

After they left, Richardson went into the kitchen to get a drink of water. While he was at the sink, he heard a yell coming from between his house and the house next door. When Richardson looked outside, he allegedly saw Hale running between the house with a nickel-plated .38 pistol in his hand. He said Hale was dressed in a black ski jacket, black jeans, and a black skull cap. According to Richardson, he heard the gun discharge, and Triplett fell backwards. Maxwell fell face down. Richardson claimed that Hale then jumped on top of Triplett, grabbed a white plastic grocery bag which he put under his jacket, and then he took off running back between the houses (T 1/30/01, 24-31).

According to Richardson, Maxwell jumped up with a pistol in his hand and started running towards the back of the house. He ran out of sight, but then returned and knocked on the side door. Richardson answered the door with a gun in his hand; he let Maxwell in, and then ran upstairs to get dressed, as he was still in his boxers. Maxwell hand him a gun and a large sum of money, which Richardson put under the stereo system. Richardson and Maxwell carried Triplett to the Ford Expedition and transported him to Holy Cross Hospital. However, Richardson and Maxwell only stayed at the hospital for a minute because Richardson knew the police would be coming (T 1/30/01, 31-34). When they returned to Irvington Street, Reese was standing outside. Richardson exited the Expedition and told Reese and Maxwell to drive around the block a couple of times to see if they saw anybody. When Reese and Maxwell returned, Maxwell retrieved his gun and the money, and then returned to Flint (T 1/30/01, 35-36).

Later the same day, Hale allegedly called Richardson and told him to come over to split the money. When Richardson went to Hale's house, Hale allegedly told him that "he didn't mean to shoot Mr. Triplett, that the gun slipped." Richardson testified that he watched Hale count out the money, which was $30,000. He claimed that Hale gave him $10,000 "to keep my mouth closed." (T 1/30/01, 40-43).

About a week later, Richardson went down to Homicide with a lawyer because Reese had told him that they had been to the house. He did not make a formal statement at that time (T 1/30/01, 36).

Richardson did not make a formal statement to the police until March 17, 2000 after he had been indicted and made a deal with the U.S. Attorney for a Rule 35 downward departure, which would cut his 292-month sentence in half. The deal included his testimony at Mr. Hale's trial. Richardson's trial attorney, Bertram Johnson, "told me that you'll have to get on the stand. You will need a conviction on it." (T 1/30/01, 36-39).

On cross-examination, Richardson testified that he was arrested by federal authorities in April 1999 (T 1/30/01, 45). According to Richardson, Defendant Hale

9

did not know Triplett or Maxwell (T 1/30/01, 50).  At the time of the instant trial, Reese was dead; he died in the beginning of 2000 (T 1/30/01, 52, 72).  He conceded that at the preliminary exam, he said that he was not looking out the window when the shot was fired, and that it was only when he heard the shot that he looked out the window (T 1/30/01, 65-66).  When Maxwell knocked on the side door after the shooting, Richardson told him that he heard the shooting and he knew Triplett was shot because he was looking out the window.  When Richardson and Maxwell carried Triplett out to the Expedition, Reese was on the sidewalk (T 1/30/01, 67-68).  According to Richardson, Reese knew Triplett, but Hale did not (T 1/30/01, 68).  Richardson did not want to stay at the hospital because he panicked and because he had warrants.  He acknowledged that at the preliminary exam, he denied having any warrants out for his arrest (T 1/30/01, 70-71).  Richardson claimed he didn't lie at the preliminary exam because he wasn't expecting anything at that time, but "he was hoping" (T 1/30/01, 77-78).

On redirect, Richardson confirmed that at the preliminary exam, he testified that when he looked outside he "saw Mondo turn around and the gunshot went off. He fell on his back.  Jerome Hale running between the house with a black jacket on, skull cap and a nickel plated pistol in his hand."  (T 1/30/01, 81-82).  Richardson identified Exhibit 7 as a letter dated March 15, 2000 written by U.S. Attorney Mark Jones to Judge Gadola (T 1/30/01, 83).

When the prosecutor on redirect tried to show a prior consistent statement after defense counsel had impeached Richardson with a prior inconsistent statement, defense counsel objected.  The trial court had to tell defense counsel what the prosecutor was doing and that it was allowed as rehabilitation with a prior consistent statement (T 1/30/01, 80-81).

Dr. Carl Schmidt, Deputy Chief Medical Examiner for Wayne County, testified that the autopsy revealed that Mr. Triplett suffered a gunshot wound on the left side of his trunk.  According to Dr. Schmidt, the bullet entered underneath the left armpit approximately eight or nine inches.  There was no evidence of close range firing (T 1/30/01, 97-102).

The preliminary exam testimony of William Maxwell was read into the record.  The testimony revealed that Maxwell had known Amondo Triplett for 10-12 years.  On January 17, 1999, about 8:00 a.m., Maxwell drove Triplett from Flint to Detroit in a Ford Expedition.  Triplett showed him a large amount of money.  Before they exited the highway, Triplett called Todd Richardson and told him that they were stopping by his house to get directions to a coney island on Gratiot.  When they arrived at Richardson's house, Maxwell parked in front of the driveway.  Triplett exited the car and walked up to the house.  Triplett then told Maxwell to park in front of the house and come in.  According to Maxwell, Detroit had just received 2-1/2 feet of snow and they had to enter the house through the side door because the front door was snowed in (T 1/30/01, 105-108).

When they entered Richardson's house, Triplett asked Richardson for directions to the coney island on Gratiot where he was supposed to meet someone. As Triplett and Maxwell were leaving about 10:15 a.m., Maxwell was confirming

the directions with Richardson.  After Richardson closed the door and Maxwell took three or four steps, Maxwell saw Triplett look back over his shoulder and he had a shocking look on his face.  When Maxwell looked back, he saw a guy with a big chrome revolver, wearing a black coat and a little black hat.  The guy "kind of laughed and said what's up."  Maxwell identified Defendant Hale as the person he saw.  Maxwell testified that Hale put a gun up to him and told Maxwell to get down.  After Maxwell got down on the ground, he heard Hale allegedly ask Triplett, "Where the money?"  Triplett said, "Here it is, man" and Maxwell heard the noise of the plastic bag it was in.  When Hale allegedly asked what Maxwell had, Triplett said nothing.  Maxwell then heard a shot and froze.  After he heard footsteps, he looked up to see what was happening.  When he didn't see anyone, he got up and ran to the back of the house where the person had come from.  He didn't see anything and he returned to where Triplett was laying on the ground with a gunshot wound.  When Maxwell asked where he was hit, Triplett couldn't speak but he grabbed his arm and squeezed; Maxwell could see that he was shot right up under the arm.  Maxwell ran to the side door and told Richardson that Mondo had been shot and that Richardson needed to take them to the hospital.  Richardson told him to hold on because he didn't have any pants on.  When Richardson came outside, they carried Triplett to the Expedition and Richardson drove them to the hospital.  They didn't stay at the hospital because Richardson said he had warrants and didn't want to talk to the police.  Richardson drove back to his house, and then Maxwell returned to Flint (T 1/30/01, 108-116).

Maxwell testified that after they left the hospital, he called Triplett's mother on the cell phone and advised her that Triplett had been shot; Richardson told her the hospital he was in (T 1/30/01, 117).  Maxwell admitted that on the way to the hospital, he removed some money out of Triplett's coat pocket.  He estimated it was about $5,000.  According to Maxwell, the plastic bag of money was missing (T 1/30/01, 118).

On cross-examination, Maxwell testified that although Triplett didn't say, he knew Triplett was either going to buy drugs or a car with the amount of money he had (T 1/30/01, 120-121).  Maxwell testified that they also stopped at Richardson's house because they wanted to buy some weed from Richardson.  They looked at some while they were there, but they were supposed to return to Richardson's to buy the weed after they left the coney island (T 1/30/01, 121-122).  According to Maxwell, Triplett showed him the plastic bag of money before they left Flint; Triplett told him it was about $32,000 to $36,000.  Triplett stuffed the money in the front of his pants (T 1/30/01, 122-124).

Maxwell testified that he made several statements to the police.  At the time of his January 18, 1999 statement, the police considered him to be a suspect.  In his first statement, he did not tell the police he took money out of Triplett's coat.  In his second statement dated January 20, 1999, he told the police he took two stacks of money and gave it to his girlfriend.  The police retrieved it when they searched the house (T 1/30/01, 134-142).  Although Maxwell referred to Defendant as Jerome in court, he testified that he had never seen Defendant before; he testified that he

11

learned the name from the proceedings (T 1/30/01, 131-132, 145-148).  Maxwell testified that he did not know anyone named Reese (T 1/30/01, 125).  Maxwell and Richardson were not friends, but Maxwell had seen him a couple of times, including two weeks before the shooting when he and Triplett came to Detroit (T 1/30/01, 147).

Officer Thomas Smoot testified that on January 20, 1999 he assisted in executing a search warrant at Maxwell's address at 2063 Newborn Road in Flint.  A shoe box containing $3990 was found in a bedroom closet (T 1/30/01, 150-152).

Shirley Triplett testified that she identified her son's body at Holy Cross Hospital on January 17, 1999 (T 1/30/01, 153-154).

The prosecution rested and the parties agreed to waive the remaining witnesses on the prosecution's witness list (T 1/30/01, 155-158).

Defense counsel indicated for the record that she filed two witness lists and that her investigator attempted to find the witnesses.  However, the witnesses were not subpoenaed due to " a variety of reasons, either through the unavailability, willingness, or change in theory between my client and I" (T 1/30/01, 161-162). Defendant Hale confirmed on the record that they went over everything (T 1/30/01, 162-163).  Defendant also confirmed that he did not want to take the stand (T 1/31/01, 6).

After closing arguments and instructions, the jury deliberated and returned a verdict of guilty of felony murder and felony firearm (T 2/1/01, 6-8).

Def.-Appellant's Br. on Appeal, in *People v. Hale*, No.  234038 (Mich. Ct. App.), at 1-9.

C.    *Procedural Default*

Respondent first contends that petitioner's claims are barred by petitioner's procedural default in the state courts, because petitioner failed to raise these claims on direct appeal.  For the reasons that follow, the Court should conclude that Claims I and II are not barred; that Claims III through IX are defaulted but that it is nevertheless necessary to address the claims on the merits; and that Claims X through XII are procedurally defaulted and barred from habeas review.

1.    *Procedural Default Generally*

Under the procedural default doctrine, a federal habeas court will not review a question of federal law if the state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment.  *See Coleman v.*

12

*Thompson*, 501 U.S. 722, 729 (1991).  However, "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar." *Harris*, 489 U.S. at 263.  Furthermore, "only a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review . . . of a federal constitutional claim." *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348-51 (1984)). If a claim is procedurally defaulted, a habeas court may not review the claim unless the petitioner establishes cause for, and prejudice attributable, to the default, or that failure to consider the claim will result in a fundamental miscarriage of justice.  *See Coleman*, 501 U.S. at 750.

    2.    *Analysis*

        *a. Claims Raised on Direct Appeal (Claims I & II)*

Petitioner's first two claims, challenging the trial judge's comments during *voir dire* and counsel's performance in failing to object to that conduct, were raised on petitioner's direct appeal. The ineffective assistance of counsel claim was addressed on the merits by the court of appeals, *see Hale*, 2002 WL 31953819, at *3, and thus is not procedurally defaulted.  Petitioner's challenge to the trial judge's comments is defaulted.  In addressing this claim, the Michigan Court of Appeals concluded that, because of petitioner's failure to object, review was limited to determining whether there was plain error.  *See id*. at *1.  This contemporaneous objection rule was firmly established at the time of petitioner's trial.  *See, e.g.*, *People v. Duncan*, 402 Mich. 1, 15-16, 260 N.W.2d 58, 61-62 (1977); *People v. Curry*, 175 Mich. App. 33, 39, 437 N.W.2d 310, 314 (1989).  As the state court clearly and expressly relied on this state procedural rule with respect to petitioner's jury instruction claims, these claims are barred absent a showing of either cause and prejudice or a

13

fundamental miscarriage of justice. *See Engle v. Isaac*, 456 U.S. 107, 125-129 (1982) (state contemporaneous objection rule is adequate procedural bar precluding consideration of habeas claims).

However, even were the Court to conclude that petitioner's first claim is procedurally defaulted, it is still necessary to consider the claim on the merits. As noted above, petitioner can still have his defaulted claim reviewed on the merits if he can show cause for, and prejudice attributable to, his default in the state courts. Petitioner contends that his counsel was ineffective for failing to object at trial. If petitioner's position is correct, counsel's ineffectiveness may constitute cause to excuse any procedural default. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Consideration of counsel's effectiveness, however, depends in part on consideration of petitioner's underlying claims. Given that the cause and prejudice inquiry merges with an analysis of the merits of petitioner's defaulted claims, it is better to simply consider the merits of these claims, even if they are defaulted. *See Jamison v. Collins*, 100 F. Supp. 2d 647, 676 (S.D. Ohio 2000); *Watkins v. Miller*, 92 F. Supp. 2d 824, 832 (S.D. Ind. 2000); *cf. Strickler v. Greene*, 527 U.S. 263, 282 (1999) (considering merits of petitioner's habeas claims where inquiry into the merits mirrored cause and prejudice inquiry).

### b. *Claims Raised in First Motion for Relief from Judgment (Claims III-IX)*

A similar analysis holds for petitioner's Claims III-IX, which were initially raised in his first motion for relief from judgment in the state court. The trial court denied petitioner's motion for relief from judgment, concluding that petitioner's claims were without merit and that petitioner had failed to establish good cause for his failure to raise the claims on direct appeal, as required by MICH. CT. R. 6.508(D)(3). *See People v. Hale*, No. 00-008301-01 (Wayne County, Mich., Cir. Ct.

14

Apr. 26, 2005).  The Michigan Court of Appeals and Michigan Supreme Court ultimately denied

petitioner's applications for leave to appeal based on petitioner's "failure to meet the burden of

establishing entitlement to relief under MCR 6.508(D)."  *People v. Hale*, No. 263293 (Mich. Ct.

App. Feb. 10, 2006); *People v. Hale*, 476 Mich. 864, 720 N.W.2d 304 (2006).  In light of the trial

court's express reliance on Rule 6.508(D)(3), the Michigan appellate courts' subsequent reliance

on Rule 6.508(D) was sufficient to invoke the procedural bar of Rule 6.508(D)(3).  *See Ivory v.*

*Jackson*, 509 F.3d 284, 292-93 (6th Cir. 2007); *Simpson v. Jones*, 238 F.3d 399, 408 (6th Cir. 2000).

Again, however, it is necessary to address the merits of this claims in light of petitioner's

assertion that appellate counsel was ineffective in failing to raise these claims on direct appeal.  As

noted above, counsel's ineffectiveness in failing to raise these claims can constitute cause, *see*

*Edwards*, 529 U.S. at 451; *Murray*, 477 U.S. at 488.  And, similar to the trial counsel context, to

demonstrate that appellate counsel was ineffective petitioner must show, *inter alia*, that his claims

would have succeeded on appeal.  *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *McCleese*

*v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996).  Given that the cause and prejudice inquiry

merges with an analysis of the merits of petitioner's defaulted claims, it is better to simply consider

the merits of these claims, even if they are defaulted.

### c. Claims Raised in Second Motion for Relief from Judgment (Claims X-XII)

A different analysis holds, however, for petitioner's claims X-XII, which were first raised

in his second motion for relief from judgment.  As with petitioner's other claims, these claims are

procedurally defaulted.  Petitioner was prevented from presenting these claims because he had

previously filed a motion for relief from judgment which did not include the claims, and thus he was

barred from presenting them in a second motion for relief from judgment.  *See* MICH. CT. R.

15

6.502(G), 6.508(D).  The Michigan appellate courts expressly relied on Rule 6.502(G) in rejecting his claims, thus invoking the procedural bar.  Unlike with his other claims, however, petitioner's assertion that appellate counsel was ineffective for failing to raise these claims on direct appeal could not, if established, provide cause to excuse his default.  This is because petitioner's default was not in failing to raise the claims on direct appeal, but his failure to raise them in his first motion for relief from judgment.  And with respect to that motion, petitioner had no constitutional right to counsel to pursue postconviction relief, and thus petitioner cannot establish cause by the absence of such counsel on his first motion for relief from judgment.  *See Coleman*, 501 U.S. at 752; *Ritchie v. Eberhart*, 11 F.3d 587, 591-92 (6th Cir. 1993); *Gentry v. Trippett*, 956 F. Supp. 1320, 1326 (E.D. Mich. 1997).  Nor can he rely on the fact that he was proceeding *pro se* in his second motion for relief from judgment.  A petitioner's "pro se status and his corresponding lack of awareness and training on legal issues do not constitute adequate cause" to excuse a procedural bar.  *Rodriguez v. Maynard*, 948 F.2d 684, 688 (10th Cir. 1991); *see also*, *Haley v. United States*, 78 F.3d 282, 285 (7th Cir. 1996); *McCowin v. Scott*, 67 F.3d 100, 101-02 (5th Cir. 1995); *Charron v. Gammon*, 69 F.3d 851, 859 (8th Cir. 1995); *Lewis v. United States*, No. 96-3092, 1997 WL 49028, at *3 (6th Cir. Feb. 4, 1997) (per curiam).  Accordingly, the Court should conclude that Claims X-XII are barred by petitioner's procedural default in the state courts.

D.     *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996).  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).  Amongst other amendments, the AEDPA amended the substantive standards for granting habeas

16

relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

17

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

E.    *Jury Voir Dire (Claim I)*

Petitioner first claims that he was denied a fair trial by the judge's *voir dire* comments admonishing the jurors regarding their responsibilities as jurors. The Court should conclude that

18

petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

A judge's comments will provide a ground for habeas relief only if the comments deprived the petitioner of a fair trial.  Unlike an appellate court on direct appeal, a federal habeas court does not exercise supervisory powers over the state courts, *see Murphy v. Florida*, 421 U.S. 794, 797 (1975), and thus a federal court's habeas jurisdiction is limited to correcting violations of federal constitutional law; it does not have the authority to correct perceived injustices absent a constitutional violation.  *See Guinan v. United States*, 6 F.3d 468, 470-71 (7th Cir. 1993); 28 U.S.C. § 2254(a) (emphasis added) (federal court has jurisdiction to entertain petition brought by state prisoner "*only* on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.").[2]

As the Sixth Circuit has explained:

> Unless they amount to constitutional violations, prejudicial comments and conduct by a judge in a criminal trial are not proper subjects for collateral attack on a conviction.  In collateral proceedings, the test is whether the errors alleged could have rendered the trial fundamentally unfair.  To violate a defendant's right to a fair trial, a trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent and be adverse to the defendant to a substantial degree.

*McBee v. Grant*, 763 F.2d 811, 818 (6th Cir. 1985) (internal quotations, citations, and alterations omitted).  Or as the Ninth Circuit has explained, on habeas review "the question is not simply whether the trial judge committed misconduct or whether [a federal appellate court] would reverse a conviction obtained after a trial in which a federal judge behaved in the same manner.  Rather, we

---

[2]In contrast, a federal court may use its supervisory powers over lower federal courts and federal prosecutors to correct injustices.  *See United States v. Leslie*, 783 F.2d 541, 569-70 (5th Cir. 1986) (en banc) (Williams, J., dissenting), *vacated*, 479 U.S. 1074 (1987); *United States v. Crawford*, 466 F.2d 1155, 1157 (10th Cir. 1972).

must ask whether the state trial judge's behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995); *accord Harrington v. Iowa*, 109 F.3d 1275, 1280 (8th Cir. 1997). In other words, to warrant habeas relief "there must be an 'extremely high level of interference' by the trial judge which creates 'a pervasive climate of partiality and unfairness.'" *Duckett*, 67 F.3d at 740 (quoting *United States v. DeLuca*, 692 F.2d 1277, 1282 (9th Cir. 1982)).

      2.     *Analysis*

Petitioner contends that the trial judge committed misconduct and deprived him of a fair trial by sternly, sometimes angrily, responding to jurors who indicated some reason why they could not serve. During *voir dire*, the judge asked whether any prospective juror had religious views which would make it difficult to render a decision. Prospective Juror 5 indicated that she believed in spirituality and did not feel that she could judge another person. *See* Trial Tr., dated 1/29/01, at 37. The judge attempted to explain to Juror 5 that there is a separation between the spirituality of religion and secular laws, and engaged in an extended discussion with Juror 5 about this concept, appearing to express frustration with her inability to grasp the distinction. *See id*. at 38-42. At the end of the discussion, the judge excused Juror 5. *See id*. at 42. The venireman chosen to replace Juror 5 then indicated that he would have a hard time judging someone because of his service in the military and his belief in the law. *See id*. at 43. The judge again engaged in an extensive discussion of the matter with the prospective juror, trying to explain the role of a trial and a juror and to show that the juror's position was not logical. *See id*. at 44-48. Later during *voir dire*, Prospective Juror 10 indicated that he was going through a bad experience in a civil case, and had a bad opinion of the law. *See id*. at 69. The judge again admonished the prospective juror concerning his role as a juror,

20

*see id*. at 69-70, and the juror indicated that he could keep his personal feelings out of the case, *see id*. at 70.  Finally, later in the *voir dire* Prospective Juror 9 indicated that the nature of the case–a murder involving drug use–could affect her ability to be fair and impartial.  *See id*. at 92.  The judge informed her that she does not "set the standards of law.  I do that," and asked what her problem would be with following his instructions.  *Id*. at 94.  The juror responded that it would bother her, and the judge again admonished the prospective jurors regarding their roles as jurors.  *See id*. at 95-96.  Although each of the prospective jurors involved in the above exchanges were ultimately excused from petitioner's jury, *see id*. at 42, 78, 87, 103, petitioner contends that he was denied a fair trial because the judge's comments affected the remainder of the jury pool.  The Court should reject this claim.

Here, the trial judge's comments did not create a climate of partiality or bias, were not directed in any way toward petitioner, his defense, or defense counsel, and did not touch upon any of the facts relevant to the case.  Rather, the judge's comments were merely correct statements to the prospective jurors regarding their roles as jurors.  It is true that even the cold record reveals that the judge was exasperated with some of the prospective jurors and frustrated with their inability to comprehend their duties as jurors, but petitioner does not indicate how this frustration, directed at specific prospective jurors who were excused from service, impacted the ability of the other prospective jurors to be fair and impartial and to follow the law.  The judge's comments did not intimate his views of the case, the law, or the evidence, and were related solely to correct explanations of the roles of jurors as finders of fact in a criminal case.  "These comments, while perhaps somewhat intemperate, do not demonstrate bias against" petitioner or his defense, "but a frustration with the inherent difficulty of finding prospective jurors."  *People v. Avila*, 208 P.3d 634,

21

666-67 (Cal. 2009).  "The judge's comments, taken as a whole, make it clear that his intent was to express his belief that the venire members had a duty as citizens to serve on a jury . . . [and] [t]he comments had nothing to do with the case about to be tried before those who were chosen to serve as jurors."  *Evans v. Cockrell*, 285 F.3d 370, 376 (5th Cir. 2002).  These comments, even if undesirable, did not "reach[] a level of prejudice that would have denied [petitioner] a fair trial."  *Id.* (no denial of fair trial by judge's comments that jurors who avoided service would have no cause to complain if they became the victims of crime); *see also*, *United States v. Ulrich*, 953 F.2d 1082, 1083-84 (8th Cir. 1991) (in response to juror who expressed view that fact that defendant was on trial gave the government a head start, judge's comment likening criminal trial to a race between the prosecution and defendant did not deny defendant a fair trial because it was not "the kind of one-sided intervention by a trial judge that destroyed the impartiality of the trial."); *Avila*, 208 P.3d at 666-67 (judge's comments attempting to explain to juror difference between religious and secular law, and other comments admonishing prospective jurors that if they lied in giving a reason why the could not serve they could be held in contempt, did not deprive defendant of a fair trial or demonstrate judicial bias).  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.     *Sufficiency of the Evidence (Claim IV)*

Petitioner next contends that the prosecution presented insufficient evidence to prove his guilt beyond a reasonable doubt.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.     *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against

22

conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution. *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992). In determining the sufficiency of the evidence, the court must give circumstantial evidence the same weight as direct evidence. *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993). However, under the amended version of § 2254(d)(1) a federal habeas court must apply a more deferential standard of review of the state court decision. Thus, the question here is whether the Michigan Court of Appeals's application of the *Jackson* standard was reasonable. *See Gomez v. Acevedo*, 106 F.3d 192, 198-200 (7th Cir. 1997), *vacated on other grounds sub nom. Gomez v. DeTella*, 522 U.S. 801 (1998); *Restrepo v. DiPaolo*, 1 F. Supp. 2d 103, 106 (D. Mass 1998).

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

23

Under Michigan law, the common law crime of murder is defined as second degree murder, and is punishable by up to life imprisonment. *See* MICH. COMP. LAWS § 750.317. To establish second degree murder, the prosecution must show that the defendant killed a human being with malice aforethought. In order to show malice aforethought, the prosecution must establish one of three mental states on the part of the defendant at the time of the killing: (1) intent to kill; (2) intent to commit great bodily harm; or (3) intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result. *See People v. Dykhouse*, 418 Mich. 488, 495, 345 N.W.2d 150, 151 (1984); *People v. Aaron*, 409 Mich. 672, 713-14, 299 N.W.2d 304, 319-20 (1980). Certain additional elements elevate second degree murder to first degree murder, which is punishable by a mandatory term of nonparoleable life imprisonment. Under Michigan law, first degree murder includes "[*m*]*urder* committed in the perpetration of, or attempt to perpetrate, arson, criminal sexual conduct in the first, second, or third degree, child abuse in the first degree, a major controlled substance offense, robbery, breaking and entering of a dwelling, home invasion in the first or second degree, larceny of any kind, extortion, or kidnapping." MICH. COMP. LAWS § 750.316(1)(b) (emphasis added), as well as murder committed with premeditation, MICH. COMP. LAWS § 750.316(1)(a). Under either theory of first degree murder, the prosecution must show that a defendant had the mental state necessary for murder, that is, malice aforethought. *See generally*, *People v. Aaron*, 409 Mich. 672, 713-21, 299 N.W.2d 304, 319-323 (1980); *People v. Turner*, 213 Mich. App. 558, 556, 540 N.W.2d 728, 732-33 (1995) (per curiam). Under Michigan law, malice is established by showing that the defendant possessed one of three mental states: (1) intent to kill; (2) intent to do serious bodily harm; or (3) wanton and willful disregard for the likelihood that the natural tendency of his act is to cause death or great bodily harm. *See*

24

*Aaron*, 409 Mich. at 733, 299 N.W.2d at 328.  Thus, the elements of first degree felony murder are: "(1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result; (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in M.C.L. § 750.316." *Turner*, 213 Mich. App. at 566, 540 N.W.2d at 732.

    2.    *Analysis*

Petitioner contends that the evidence was insufficient because there was no physical evidence tying him to the crime, and the only evidence against him came from two admitted drug dealers who stood to gain by their testimony and who did not report their knowledge to the police until well after the crime.  Petitioner also argues that the evidence is insufficient because no one testified that they saw him rob the victim.  The Court should conclude that petitioner's argument is without merit.

There is no question that the testimony of Richardson and Maxwell, if believed by the jury, provided sufficient evidence to support petitioner's convictions.  Richardson testified that he heard a gunshot, looked outside, and saw petitioner running away with a gun in his hand.  He also testified that petitioner called him after the murder and gave him $10,000 to keep quiet about the matter. Maxwell testified more directly that he saw the victim with a surprised look on his face, and turned around to see petitioner holding a gun and laughing.  Petitioner then demanded money from the victim.  This testimony, if believed by the jury, was more than sufficient to conclude that petitioner intentionally shot the victim.  And, notwithstanding petitioner's arguments regarding their credibility, it was the job of the jury to weigh the credibility of the evidence and resolve conflicts in the evidence, and this Court must presume that the jury resolved those conflicts in favor of the

prosecution.  *See Jackson*, 443 U.S. at 326; *United States v. Sherwood*, 98 F.3d 402, 408 (9th Cir. 1996).   A reviewing court, whether on direct appeal or habeas review, "do[es] not make credibility determinations in evaluating the sufficiency of the evidence."  *United States v. Owusu*, 199 F.3d 329, 344 (6th Cir. 2000); *Walker v. Russell*, 57 F.2d 472, 475-76 (6th Cir. 1995); *see also*, *United States v. Bailey*, 444 U.S. 394, 414-15 (1980) ("It is for [jurors] and not for appellate courts to say that a particular witness spoke the truth or fabricated a cock-and-bull story.").   This conclusion is not altered by petitioner's argument that the evidence was insufficient because there was no forensic evidence tying him to the crime.   "Lack of physical evidence does not render the evidence that is presented insufficient."  *United States v. Magallanez*, 408 F.3d 672, 681 (10th Cir.2005); *see also*, *O'Hara v. Brigano*, 499 F. 3d 492, 500 (6th Cir. 2007) (victim's testimony alone sufficient even though not corroborated by other witnesses or physical evidence); *United States v. Bieghler*, 198 Fed. Appx. 566, 568 (8th Cir. 2006) ("'[F]orensic evidence' is not required for conviction.").

Likewise, there was sufficient evidence presented to show that petitioner robbed the victim immediately after the victim was shot by petitioner.  Maxwell testified that he heard petitioner demand the victim's money, and heard a sound consistent with the plastic bag in which the victim had kept the money.  When Maxwell later searched the victim's pockets and took some money himself, the bulk of the money that the victim had on him at the time of the shooting was gone.  Further, Richardson testified that after the shooting petitioner had $30,000–a portion of which he gave to Richardson–consistent with Maxwell's testimony concerning the amount of money the victim was carrying at the time of the shooting.  This evidence was more than sufficient for the jury to conclude, beyond a reasonable doubt, that petitioner robbed the victim.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on his sufficiency of the evidence

claim.

G.    *Suggestive Line-Up (Claim V)*

Petitioner next contends that he was denied a fair trial because Richardson's and Maxwell's identifications of him were tainted by impermissibly suggestive line-up procedures. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.    *Clearly Established Law*

A pre-trial identification procedure violates the Constitution if "the confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law." *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967). Similarly, a subsequent in-court identification following an impermissibly suggestive pre-trial identification is unconstitutional if the pre-trial "identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). *See generally*, *Neil v. Biggers*, 409 U.S. 188, 197-98 (1972). A suggestive line-up alone, however, does nor require exclusion of identification evidence. "The admission of testimony concerning a suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability." *Manson v. Brathwaite*, 432 U.S. 98, 106 (1977). Thus, the central question in a case where the pre-trial identification procedure is impermissibly suggestive is "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Biggers*, 409 U.S. at 199; *accord Manson*, 432 U.S. at 114. The factors relevant to this "totality of the circumstances" analysis include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior

27

description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Biggers*, 409 U.S. at 199-200; *accord Manson*, 432 U.S. at 114.

Thus, a court must "follow[] a two-step analysis in determining whether an identification is admissible." *United States v. Crozier*, 259 F.3d 503, 510 (6th Cir. 2001). First, the court must "consider whether the identification procedure was suggestive." *Id.* If it was not, the "identification testimony is generally admissible without further inquiry," and any question as to the reliability of the identification "goes to the weight of the evidence, not its admissibility." *United States v. Maldonado-Rivera*, 922 F.2d 934, 973 (2d Cir. 1990). If, on the other hand, the procedure was suggestive, the court must "then determine whether, under the totality of the circumstances, the identification was nonetheless reliable and therefore admissible." *Crozier*, 259 F.3d at 510.

2.    *Analysis*

Here, there was no testimony presented at trial regarding any pretrial identification of petitioner. Rather, there was only in-court identification of petitioner made by Richardson and Maxwell. Thus, the question here is whether the in-court identifications made by Richardson and Maxwell were tainted by an impermissibly suggestive pre-trial identification procedure. The Court should conclude that they were not.

Although the record is not entirely clear regarding the line-ups, petitioner does not contend that Richardson participated in any line-ups. Rather, petitioner points to two photographic line-ups and one live line-up involving Maxwell. And because Richardson did not participate in any line-up, his identification of petitioner at trial was a matter for the jury to weigh. As I have previously explained,

28

the Supreme Court has never held that an in-court identification requires an independent basis for admission in the absence of an antecedent improper pre-trial identification. Rather, "[g]enerally if identification procedures prior to trial were not unduly suggestive, questions as to the reliability of a proposed in-court identification affect only the identification's weight, not its admissibility." *United States v. Matthews*, 20 F.3d 538, 547 (2d Cir.1994). Thus, "[a]ny suggestiveness in the courtroom identification procedure is a matter for the jury to consider in weighing the persuasiveness of the witness's testimony." *Romero v. Tansy*, 46 F.3d 1024, 1032 (10th Cir.1995); *see also*, *McFowler v. Jaimet*, 349 F.3d 436, 450 n. 3 (7th Cir.2003).

*Cameron v. Birkett*, 348 F. Supp. 2d 825, 843 (E.D. Mich. 2004) (Gadola, J., adopting report of Komives, M.J.); *see also*, *Long v. Donnelly*, 335 F. Supp. 2d 450, 459 (S.D.N.Y. 2004).  Here, Richardson's in-court identification was subject to cross-examination by petitioner's counsel, and counsel argued that Richardson's testimony was unreliable.

Further, even had Richardson participated in an impermissible suggestive pre-trial line-up, his identification testimony at trial would nevertheless have been admissible because it was reliable under the totality of the circumstances.  Indeed, there was no "identification procedure" at all in this case.  Although Richardson eventually identified petitioner to the police by name, this is not the type of identification which implicates the Due Process Clause.  *Cf. Manson*, 432 U.S. at 133 n.14 (Marshall, J., dissenting) (distinguishing between true identification procedures and a "case where the witness knew the person whom he saw committing a crime, . . .  so that the identification procedure was merely used to confirm the suspect's identity.").  There is no question that Richardson was an acquaintance of petitioner prior to the crime and was well familiar with him. Richardson testified as to the circumstances under which he observed petitioner, and Richardson knew petitioner prior to the crime.  *See Jackson v. Gammon*, 195 F.3d 349, 354 (8th Cir. 1999); *United States v. Santiago*, 174 F. Supp. 2d 16, 31-32 (S.D.N.Y. 2001).

With respect to Maxwell, petitioner asserts that Maxwell participated in two photographic

29

line-ups and one live line-up, but that Maxwell did not identify him at any of these line-ups and indeed identified someone else in one of the photographic line-ups. Even if the line-up procedures were impermissibly suggestive, Maxwell's testimony was not tainted by the pre-trial line-ups because he did not identify petitioner during those line-ups. Because Maxwell "did not identify petitioner at the pretrial line-up, . . . there was no antecedent identification which could taint h[is] subsequent in-court identification." *Dennis v. McKee*, No. 06-CV-11928, 2007 WL 2325116, at *7 (E.D. Mich. Aug. 15, 2007) (Friedman, J., adopting report of Komives, M.J.).

Further, petitioner cannot show that the pretrial photographic array was impermissibly suggestive. This prong of the inquiry "questions whether the procedure itself steered the witness to one suspect or another, independent of the witness's honest recollection." *Wilson v. Mitchell*, 250 F.3d 388, 397 (6th Cir. 2001). Thus, a line-up is impermissibly suggestive where it "emphasizes the focus on a single individual thereby increasing the likelihood of misidentification." *United States v. Montgomery*, 150 F.3d 983, 992 (9th Cir. 1998) (internal quotation omitted); *see also*, *United States v. Wong*, 40 F.3d 1347, 1359-60 (2d Cir. 1994); *Griffin v. Rose*, 546 F. Supp. 932, 936 (E.D. Tenn. 1981), *aff'd*, 703 F.2d 561 (6th Cir. 1982). In short, an identification procedure is suggestively only if it "directs undue attention to a particular" person. *State v. Ramires*, 37 P.3d 343, 350 (Wash. Ct. App. 2002). Thus, a photographic array is impermissibly suggestive if "the picture of the accused, matching descriptions given by the witness, so stands out from all of the other photographs as to suggest to an identifying witness that that person was more likely to be the culprit." *United States v. Thai*, 29 F.3d 785, 808 (2d Cir. 1994) (internal quotation omitted).

The only photographic array in the record (attached as an exhibit to petitioner's brief in the Michigan Supreme Court in connection with his first motion for relief from judgment) shows that

all of the participants were black males of roughly the same age and general build. The only factor to which petitioner points to establish suggestiveness is his distinctive hairstyle–a "high top fade" with braids, while none of the other participants had braids. This distinctive feature alone, however, does not render the photographic line-up impermissibly suggestive. "A lineup is unduly suggestive as to a given defendant if he meets the description of the perpetrator previously given by the witness and the other lineup participants obviously do not." *Raheem v. Kelly*, 257 F.3d 122, 134 (2d Cir.2001). Thus, the "focus of the inquiry is not whether the suspect has a distinctive feature not shared by the other participants, but whether that feature matches the description provided by the witness." *West v. Greiner*, No. 01 CV 1267(JG), 2004 WL 315247, at *5 (E.D.N.Y. Feb. 12, 2004). Nothing in the record indicates that either Maxwell or Richardson described petitioner has having braids or a particular haircut such that petitioner was the only line-up participant matching their descriptions of the perpetrator. Thus, the existence of a distinctive haircut alone does not render the line-up impermissibly suggestive.

For these reasons, the Court should conclude that petitioner is not entitled to habeas relief on his identification claim.

H.     *Prosecutorial Misconduct (Claims VI & VII)*

Petitioner next contends that he was denied a fair trial by prosecutorial misconduct at trial. First, petitioner contends that the prosecutor offered "compensation" to Richardson–in the form of a reduction of his federal sentence–in exchange for his testimony in violation of both state and federal law. Second, petitioner contends that the prosecutor impermissibly vouched for the credibility of the prosecution witnesses. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

31

1.     *Compensation for Testimony*

Petitioner first contends that the prosecution gave compensation to Richardson in exchange for his testimony, in violation of both Michigan and federal law.  In support of this claim, petitioner relies on MICH. COMP. LAWS § 775.7 and 18 U.S.C. § 201.  The state statute provides that a county may reimburse an indigent, out-of-state witness for travel expenses, but otherwise "no fees shall be allowed or paid to witnesses on the part of the people in any criminal proceeding or prosecution." MICH. COMP. LAWS § 775.7.  The federal statue provides, in relevant part, that it is a federal crime for someone to

> directly or indirectly, corruptly give[], offer[], or promise[] anything of value to any person, or offer[] or promise[] such person to give anything of value to any other person or entity, with intent to influence the testimony under oath or affirmation of such first-mentioned person as a witness upon a trial, hearing, or other proceeding, before any court, any committee of either House or both Houses of Congress, or any agency, commission, or officer authorized by the laws of the United States to hear evidence or take testimony, or with intent to influence such person to absent himself therefrom.

18 U.S.C. § 201(c)(3).  Even assuming that a violation of these statutes would otherwise provide a basis for habeas relief, petitioner has failed to establish a violation of these statutes.

With respect to the Michigan statute, the Michigan Court of Appeals has expressly held that the statute applies only to monetary payments, and does not prohibit a prosecutor from offering an intangible benefit such as a reduced conviction or sentence in exchange for testimony.  *See People v. Wilson*, 242 Mich. App. 350, 357-58, 619 N.W.2d 413, 418 (2000).  With respect to the federal statute, with the exception of one decision which was subsequently overturned, *see United States v. Singleton*, 144 F.3d 1343, *rev'd*, 165 F.3d 1297 (10th Cir. 1998) (en banc), the federal courts have uniformly held that "a favorable plea agreement in exchange for truthful testimony does not violate § 201."  *United States v. Orr*, 136 Fed. Appx. 632, 637 (5th Cir. 2005) (citing *United States v.*

32

*Haese*, 162 F.3d 359, 368 (5th Cir. 1998)); *accord United States v. Johnson*, 169 F.3d 1092, 1097-98 (8th Cir. 1999); *United States v. Lowery*, 166 F.3d 1119, 1123 (11th Cir. 1999); *United States v. Ware*, 161 F.3d 414, 419-23 (6th Cir. 1998).  Thus, petitioner cannot show that the promise of leniency to Richardson in exchange for his testimony violated either the Michigan or federal statute relied upon by petitioner.

In support of his argument petitioner also points to the Supreme Court's decisions in *Napue v. Illinois*, 360 U.S. 264 (1959) and *Giglio v. United States*, 405 U.S. 1520 (1972).  In these cases, the Supreme Court held that a defendant's right to a fair trial may be violated where the prosecution deliberately misleads a jury, or allows misleading testimony to go uncorrected, with respect to any promises offered a key prosecution witness in exchange for his testimony.  *See Giglio*, 405 U.S. at 153-54; *Napue*, 360 U.S. at 268-69.  In order to establish a *Napue/Giglio* violation, petitioner must show (1) that there was a promise of aid or leniency by the prosecution, (2) which was undisclosed to the jury, and (3) which may have affected the jury's verdict.  *See Zeigler v. Callahan*, 659 F.2d 254, 263 (1st Cir. 1981).  Although petitioner notes this general rule, he does not explain how it was violated in his case.  Richardson testified at trial that, in exchange for his testimony against petitioner in the state case, the Assistant United States Attorney would move for a Rule 35 departure which would reduce in half petitioner's 292 month federal sentence. *See* Trial Tr., dated 1/30/01, at 37-39.  Petitioner does not allege that any other promise was made to Richardson that was not disclosed.  Because the deal given to Richardson in exchange for his testimony was presented to the jury, petitioner cannot establish a *Napue/Giglio* violation.

Petitioner also suggests that Richardson's testimony in exchange for leniency violated his general right to due process of law.  Petitioner has cited, and I have found, no cases suggesting that

33

the practice of offering a cooperating witness leniency in exchange for his testimony constitutes a

due process violation.  On the contrary, "[n]o practice is more ingrained in our criminal justice

system than the practice of the government calling a witness who is an accessory to the crime for

which the defendant is charged and having that witness testify under a plea bargain that promises

him a reduced sentence."  *United States v. Cervantes-Pacheco*, 826 F.2d 310, 315 (5th Cir. 1987).

As the Sixth Circuit observed, "[t]he prosecutorial prerogative to recommend leniency in exchange

for testimony dates back to the common law in England and has been recognized and approved by

Congress, the courts, and the Sentencing Commission of the United States."  *Ware*, 161 F.3d at 419.

A practice so deeply ingrained in this nation's history and laws cannot be said to violate due process.

*See Washington v. Glucksberg*, 521 U.S. 702, 710 (1997) ("We begin, as we do in all due process

cases, by examining our Nation's history, legal traditions, and practices."); *Hurtado v. California*,

110 U.S. 516, 528 (1884) ("[A] process of law, which is not otherwise forbidden, must be taken to

be due process of law, if it can show the sanction of settled usage in both England and in this

country.").  As the Supreme Court observed in a case involving a government informant who had

both been paid and received a dismissal of pending criminal charges, Richardson

> perhaps even more than most informers, may have had motives to lie. But it does not
> follow that his testimony was untrue, nor does it follow that his testimony was
> constitutionally inadmissible. The established safeguards of the Anglo-American
> legal system leave the veracity of a witness to be tested by cross-examination, and
> the credibility of his testimony to be determined by a properly instructed jury.

*Hoffa v. United States*, 385 U.S. 293, 311 (1966).  Richardson testified concerning his agreement

with the government, and it was for the jury to decide whether he was credible.  Accordingly, the

Court should conclude that petitioner is not entitled to habeas relief on this claim.

> 2.    *Vouching for Witnesses*

34

Petitioner also contends that the prosecutor improperly vouched for the credibility of the prosecution witnesses. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

### a. Clearly Established Law

For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough that the prosecutor's conduct was "undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (internal quotation omitted). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In determining whether the prosecutor's conduct was so egregious as to warrant habeas relief, a court should consider "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury; and the strength of the competent proof to establish the guilt of the accused." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (internal quotations and citations omitted). In sum, to constitute a denial of due process the prosecutor's conduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id.* (internal quotation omitted).

### b. Analysis

Petitioner contends that the prosecutor improperly vouched for the credibility of his witnesses during the prosecutor's closing argument, in which he said:

> Now, let me say that Todd Richardson deals drugs also. So does Jerome Hale. So does Armando Triplett. William Maxwell is probably coming down here to help Armando, you know, and be his driver, get him down here and back, get his drugs. I'd ask you to think about this. If a crime was committed in a convent who would

35

you expect the witnesses to be who would come in and testify?  You would expect members of a religious order, people who were associated with that convent.  Now, keep in mind that everybody deserves the protection of our laws as well as the next person.  Armando Triplett does.  Who would you expect to be the people who would know something about his death?  It would probably be people involved in drug activity also.  Now, you would ask yourself this question as this point.  Does that mean that they are incapable of coming in here and telling you what they know about Jerome Hale's involvement in this case?  My suggestion to you is they're perfectly capable of coming in here and telling you what happened that ended Armando Triplett's life.

Trial Tr., dated 1/31/01, at 36-37.  The Court should conclude that this comment did not amount to impermissible vouching.

Improper vouching occurs either (1) "when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the [prosecutor's office] behind that witness," or (2) through "comments that imply that the prosecutor has special knowledge of facts not in front of the jury."  *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999); *see also*, *United States v. Emuegbunam*, 268 F.3d 377, 404 (6th Cir. 2001).[3]  Here, the prosecutor neither implied that he had special facts not in front of the jury nor suggested a personal belief in the witnesses' credibility.  The prosecutor did not state that he believed the witnesses, but argued only that the jury should not find them to lack credibility solely because they were involved in the drug trade.  Thus, the comment did not constitute vouching and petitioner is not entitled to habeas relief on this claim.

I.       *Ineffective Assistance of Counsel (Claims II-III, & IX)*

Petitioner next raises several ineffective assistance of counsel claims.  In Claim II, he contends that counsel was ineffective for failing to object to the trial judge's comments during *voir*

---

[3]Some cases referring to only the first type of comment as "vouching" and describe the second type of comment as "bolstering."  *See Francis*, 170 F.3d at 551.

*dire*.  In Claim III, he contends that counsel was ineffective for failing to: (1) call petitioner's alibi witnesses at trial; (2) object to prosecutorial misconduct; and (3) object to the introduction of Maxwell's preliminary examination testimony.  Finally, in Claim IX, petitioner contends that his appellate counsel was ineffective for failing present Claims III-VIII (the claims raised in his first motion for relief from judgment) on direct appeal.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.

      1.    *Clearly Established Law*

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense.  *Id*. at 687.  These two components are mixed  questions of law and fact.  *Id*. at 698.  Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."  *Id.* at 697.  If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed."  *Id.*

With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id.*  at 689; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994).  "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted).  "[T]he court should recognize that counsel

is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695.

    2.    *Trial Counsel*

            *a. Failure to Call Alibi Witnesses*

    Petitioner first contends that counsel was ineffective for failing to investigate and present at trial his alibi witnesses. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

    Generally, "[c]omplaints of uncalled witnesses are not favored in federal habeas review." *Marler v. Blackburn*, 777 F.2d 1007, 1010 (5th Cir. 1985); *Aponte v. Scully*, 740 F. Supp. 153, 158 (E.D.N.Y. 1990). As one court has explained:

> The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial. [Defendant] does not identify any witnesses that his counsel should have called who would have been helpful. Defense counsel's conduct in this regard appears to fall within the wide range of reasonable professional representation. Decisions whether to engage in cross examination, and if so to what extent and in what manner, are similarly strategic in nature.

*United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987); *accord Reese v. Fulcomer*, 946 F.2d 247, 257 (3d Cir. 1991) (counsel's performance not deficient where counsel did not call alibi witness whose testimony could have been damaging); *United States v. Porter*, 924 F.2d 395, 397 (1st Cir. 1991) (decision not to call witnesses who could have incriminated defendant within scope of informed professional judgment).

38

Petitioner's assertion that counsel failed to investigate his alibi witnesses is belied by the record. Prior to trial counsel filed both a witness list and a notice of alibi. Although counsel did not call any of the witnesses on the list or present an alibi defense, the trial transcript establishes that this was due to the inability of counsel and her investigator to locate the supposed alibi witnesses, or those witnesses' unwillingness to testify. The record also shows that petitioner agreed with the reasons for not presenting these witnesses. Specifically, following the close of the prosecution case, the following exchange occurred:

| | |
|---|---|
| MS. FORD: | . . . . I filed a witness list on my client, two of them. I have my investigator sitting to my right, Terry Feys . . . . |
| | . . . . |
| | My client did ask for some witnesses. We both tried to find them. I have subpoena forms here. My file, I was ready, willing, and able to subpoena people. It was based on my determination that they didn't want to be here. So, we came up blank. Blank faces, blank answers. So, that's why I didn't do that. Mr. Hale, you understand that, right? |
| THE DEFENDANT: | Yes, ma'am. |
| MS. FORD: | I'm referring particular [sic] to Brenda Hill – it's really Lavon Hill. You understand that, right? |
| THE DEFENDANT: | Yes, ma'am. |
| MS. FORD: | That's why they're not here. You agree with the reason. |
| THE DEFENDANT: | Yes, ma'am. |
| MS. FORD: | There were others, and I'm not going to go through the whole list. |
| THE COURT: | Frankly when I looked at your list, you know, and I read the transcript and what I perceive as the setting, you know, for this I was wondering where you got you witness list, you know, from. But there could be any number of things, character, alibi, there could be any number of factors, you know. But I was surprised when I saw your witness list. |
| MS. FORD: | There was alibi, there were people in the discovery – |
| THE COURT: | Alright. |
| MS. FORD: | For a variety of reasons, either through the unavailability, willingness, or change in theory between my client and I, they're not here. |
| THE COURT: | Very well. |

| | |
|---|---|
| MS. FORD: | It is concurrent. |
| THE COURT: | Very well.  So, you've had a chance to go through that with your client – |
| MS. FORD: | We've been through everything. |
| THE COURT: | The investigator had a chance – |
| MS. FORD: | Everything. |
| THE COURT: | Okay. |
| MS. FORD: | Is that right? |
| THE DEFENDANT: | Yes, ma'am. |

Trial Tr., dated 1/31/01, at 161-63.

Thus, the record establishes that petitioner's counsel herself and through an investigator attempted to locate the alibi witnesses, but in large part were unable to do so.  The record also establishes that those witnesses who were located were unwilling to testify on petitioner's behalf. Petitioner not only failed to contradict counsel on these matters, but affirmatively concurred in her decision not to call these witnesses and the reasons for her decision.   In these circumstances, petitioner cannot show that counsel failed to conduct a reasonable investigation concerning the witnesses, or that counsel's decision not to call the witnesses was anything other than a reasonable trial strategy.  *See Coe v. Bell*, 161 F.3d 320, 342 (6th Cir. 1998) (counsel not ineffective for failing to investigate and present alibi witnesses where record established that "these witnesses were unavailable or would not cooperate with counsel at the time of pre-trial preparation."); *see also*, *United States v. Weaver*, 882 F.2d 1128, 1140 (7th Cir. 1989) ("Where a defendant, fully informed of the reasonable options before him, agrees to follow a particular strategy at trial, that strategy cannot later form the basis of a claim of ineffective assistance of counsel."); *United States v. Williams*, 631 F.2d 198, 204 (3d Cir. 1980) (no ineffective assistance existed because the defendant ultimately concurred in his trial counsel's tactical decision).   Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### b. Failure to Object

Petitioner next contends that counsel was ineffective in failing to object to the judge's comments during *voir dire* and the prosecutor's comments during closing argument. As explained above, however, neither the judge's nor the prosecutor's comments were improper or denied petitioner a fair trial. Thus, any objection would have been meritless. Counsel cannot be deemed ineffective for failing to raise a meritless objection. *See Bradley v. Birkett*, 192 Fed. Appx. 468, 475 (6th Cir. 2006); *Anderson v. Goeke*, 44 F.3d 675, 680 (8th Cir. 1995); *Burnett v. Collins*, 982 F.2d 922, 929 (5th Cir. 1993); *White v. Withrow*, No. 00-CV-74231, 2001 WL 902624, at *12 (E.D. Mich. June 22, 2001) (Rosen, J.) (citing *United States v. Nwankwo*, 2 F. Supp. 2d 765, 770 (D. Md. 1998)) (no prejudice from counsel's failure to object to prosecutorial misconduct where prosecutor's comments did not deprive petitioner of a fair trial). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### c. Redaction of Maxwell's Testimony

Finally, petitioner contends that counsel was ineffective for failing to object to the redactions of Maxwell's testimony. Petitioner argues that the redactions to Maxwell's preliminary examination testimony, which was read into the record at trial, allowed the prosecutor to present only the favorable testimony of Maxwell. Petitioner contends that, damaging to Maxwell's credibility, Maxwell at the preliminary examination: (1) testified he had taken money from the victim's pockets on the ride to the hospital; (2) testified that he was initially considered a suspect by the police; and (3) changed his testimony regarding whether he had seen petitioner prior to the day of the incident. Again, however, this claim is belied by the record.

The record reveals that the parties agreed to redact from Maxwell's preliminary examination

41

testimony reference to (a) a polygraph examination and (b) lineups attended by Maxwell.  *See* Trial

Tr., dated 1/30/01, at 85-94.  The record does not indicate that any other testimony was redacted.

And, contrary to petitioner's argument, the direct and cross-examination testimony read into the trial

recorded included the questioning and responses relevant to Maxwell's taking of some money from

the victim, *see id*. at 118, 134, 137-38, the police consideration of Maxwell as a suspect, *see id*. at

135, and when Maxwell had seen petitioner and how he knew petitioner's name, *see id*. at 131-32,

146-48.  Thus, the record fails to support petitioner's claim that counsel allowed the portions of

Maxwell's testimony that affected Maxwell's credibility to be redacted, and petitioner accordingly

is not entitled to habeas relief on this claim.

>    3.    *Appellate Counsel*

Petitioner also contends that his appellate attorney was ineffective for failing to raise on

direct appeal the claims asserted in his first motion for relief from judgment, which are the claims

asserted as Claims III-IX in petitioner's reply brief.[4]  In the appellate counsel context, a showing of

prejudice requires a showing that petitioner's claims would have succeeded on appeal.  *See Smith*

*v. Robbins*, 528 U.S. 259, 285-86 (2000); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir.

1996).  As explained above, petitioner's underlying claims are without merit, and thus petitioner

cannot show that counsel was ineffective for failing to raise them on direct appeal.  Accordingly,

the Court should conclude that petitioner is not entitled to habeas relief on this claim.

J.    *Cumulative Error (Claim VIII)*

Finally, petitioner contends that he was denied a fair trial by the cumulative effect of the

---

[4]Petitioner also contends that appellate counsel was ineffective for failing to raise on direct appeal the claims asserted in his second motion for relief from judgment but, as noted above, that ineffective assistance of appellate counsel claim is procedurally defaulted because of petitioner's failure to raise that claim in his first motion for relief from judgment.

errors at his trial.  The Court should conclude that petitioner is not entitled to habeas relief on this basis.  It is true that "[e]rrors which standing alone may be deemed harmless or insufficiently prejudicial to amount to a denial of due process may cumulatively produce a trial setting which is fundamentally unfair." *Payne v. Janasz*, 711 F.2d 1305, 1316 (6th Cir. 1983) (Jones, J., dissenting); *accord Walker v. Engle*, 703 F.2d 959, 968 (6th Cir. 1983).  This rule, however, applies only to constitutional errors; the accumulation of non-errors cannot collectively amount to a violation of due process.  *See Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002); *United States v. Lumpkin*, 192 F.3d 280, 290 (2d Cir. 1999); *McKinnon v. Ohio*, No. 94-4256, 1995 WL 570918, at *12 (6th Cir. Sept. 27, 1995); *Fero v. Kerby*, 39 F.3d 1462, 1475 (10th Cir. 1994).  As noted and discussed in this Report, none of petitioner's claims establish constitutional error, and thus his cumulative error claim fails.

K.     *Conclusion*

In view of the foregoing, the Court should conclude that petitioner's tenth through twelfth habeas claims are barred by petitioner's procedural default in the state courts, and that petitioner's remaining habeas claims are without merit.  Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.     <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th

43

Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will

not preserve all the objections a party might have to this Report and Recommendation.  *See Willis*

*v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit*

*Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR

72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing

party may file a response.  The response shall be not more than five (5) pages in length unless by

motion and order such page limit is extended by the Court.  The response shall address specifically,

and in the same order raised, each issue contained within the objections.


s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 11/9/09


The undersigned certifies that a copy of the foregoing
order was served on the attorneys of record   by
electronic means or U.S. Mail on November 9, 2009.

s/Eddrey Butts
Case Manager

44