UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEROME A. HALE,

                       Petitioner,                 CASE NUMBER: 07-12397
                                                   HONORABLE VICTORIA A. ROBERTS

v.

BARRY D. DAVIS,

                       Respondent.

_____/

## OPINION AND ORDER GRANTING
## PETITION FOR WRIT OF HABEAS CORPUS

**I.**      **INTRODUCTION**

      This matter is before the Court on Petitioner Jerome A. Hale's application for writ of habeas corpus under 28 U.S.C. § 2254.  The Court concludes that Petitioner's Sixth Amendment right to effective assistance of counsel was violated during his state court trial.  The writ will issue unless the State takes steps to retry Petitioner within ninety days.

**II.**      **BACKGROUND AND PROCEDURAL HISTORY**

      **A.**      **Petitioner's Claims**

      On June 5,  2007, Petitioner filed a *pro se* habeas petition raising several claims for relief, including claims of ineffective assistance of trial and appellate counsel.  The Court referred the petition to Magistrate Judge Paul L. Komives, who issued a report and recommendation on November 9, 2009, recommending the Court deny the writ in

its entirety.  On January 15, 2010, Petitioner moved for an evidentiary hearing on these claims.

On September 8, 2010, the Court issued an Order adopting the Magistrate's R&R in part, and granting Petitioner's request for an evidentiary hearing in part.  The Court ordered an evidentiary hearing on the issue of ineffective assistance of trial counsel for failure to call or investigate an alibi witness; reserved ruling on whether Petitioner's appellate counsel was ineffective for failing to raise these claims on appeal; and denied habeas relief on the remainder of Petitioner's claims.

The three claims now before the Court are whether Petitioner was denied effective assistance of counsel when: (1) his trial counsel failed to investigate an alibi witness; (2) his trial counsel failed to call an alibi witness; and (3) his appellate counsel failed to raise these issues on appeal.

### B.    State Court Proceedings

On January 17, 1999, Armondo Triplett was shot and killed while leaving Todd Richardson's house.  Eighteen months later, police arrested Petitioner for Triplett's murder.

The prosecution claimed Petitioner shot and killed Triplett after robbing him.  The Petitioner claimed that the prosecution's key eyewitness, Richardson, lied because federal authorities promised to reduce his federal prison sentence of 292 months by half for his testimony and the conviction of Petitioner.

### (1). The Trial

The State relied on two eyewitnesses who identified Petitioner as the shooter: William Maxwell, who was with Triplett when he was shot, and Richardson, who said he saw the shooter from inside his house.  The weekend before Petitioner's trial began, Maxwell died, leaving Richardson as the only eyewitness.

Richardson testified to the following: During the time of the shooting, he was trafficking narcotics, and owed Petitioner $50,000 for cocaine.  Richardson never repaid Petitioner.  Sometime after the shooting, Richardson pled guilty to federal charges of conspiracy and distribution of narcotics, and was sentenced to 292 months.  However, he began cooperating with federal authorities, and they promised to cut his sentence in half if he testified against Petitioner.  His attorney told him that to receive the sentence reduction, federal authorities expected his testimony to result in a conviction.

On the day of the shooting, Richardson received a call from Triplett between 8 a.m. and 10 a.m.  A few minutes later, Petitioner arrived at Richardson's house. Richardson asked Petitioner to front him a kilo of cocaine, valued at $28,000 - $30,000. Petitioner refused, and asked Richardson to repay the $50,000.  Richardson said he told Petitioner he would get the money to Petitioner later, because he had to collect it from people who owed him.  Richardson said he also told Petitioner that Triplett was coming to buy a kilo.  Richardson said that, after hearing this, Petitioner told Richardson not to worry about the money, Petitioner would get it himself.  Apparently taking Petitioner's statement as a threat against Triplett's life, Richardson testified he told Petitioner not to shoot Triplett, and Petitioner left.

A few minutes later, Triplett and Maxwell arrived.  When they left, Richardson heard yelling outside the house.  He testified that he looked outside, and saw Petitioner running with a gun.  Richardson said he heard the gun fire, saw Triplett fall backwards, saw Maxwell fall face down into the snow, and saw Petitioner take a bag from Triplett's body and run.

Richardson testified that Petitioner called him later that day, and told him to come over and split the money he had taken from Triplett, which was about $30,000. Richardson said Petitioner told him the shooting was accidental, and gave him $10,000 to keep quiet.

Richardson did not make a formal statement to police until March 17, 2000, more than a year after the shooting, and after Richardson was indicted on federal narcotics charges. This is when Richardson struck his deal with prosecutors.

Maxwell's preliminary examination testimony was read into the record at Petitioner's trial.  Maxwell said that on the day of the murder, at about 8:00 a.m., Maxwell drove Triplett from Flint to Detroit.  While they were driving, Triplett called Richardson and told him they were going to stop by his house to get directions to a restaurant.  They went to Richardson's house, and left around 10:15 a.m.  He said that, as they were leaving, a man approached them, robbed and shot Triplett, then ran.  He identified Petitioner as the shooter.

After the shooting, Richardson and Maxwell took Triplett to the hospital, where he died.  Maxwell took about $5,000 from Triplett's coat on the way there.

Maxwell made several statements to police.  He was considered to be a suspect, and at first did not tell police that he had taken money from Triplett.  In a later statement, he admitted that he had.

On February 1, 2001, a jury convicted Petitioner of felony murder, in violation of MCLA § 750.316(1)(b); and possession of a firearm during the commission of a felony, in violation of MCLA § 750.227b.  Petitioner was sentenced to mandatory life without parole on the murder conviction, and a consecutive term of two years imprisonment on the felony-firearm conviction.

### (2). Appeals and Challenges to Petitioner's Convictions

Petitioner presented three claims in his appeal to the Michigan Court of Appeals, including ineffective assistance of trial counsel; however, Petitioner did not raise trial counsel's alleged failure to call or investigate his alibi witness.

Before the Court of Appeals decided his appeal, Petitioner filed a motion to remand pursuant to MCR 7.211(C)(1), asking the Court of Appeals to allow the trial court to develop the factual record for his ineffective assistance of trial counsel claims. In this motion, he wrote that his trial counsel violated his Sixth Amendment rights, failed to investigate and call exculpatory witnesses, and stated trial counsel's "most crucial error was her failure to call Alibi Witness Ms. Demetria Young, whose testimony would have completely exonerated defendant."  He wrote that he told his attorney about these witnesses well before trial.  He attached an affidavit signed by Young, which stated that they were together during the time of the murder. He specifically stated that he attached the affidavit to comply with the rule, which says that the motion "must be supported by

2:07-cv-12397-VAR-PJK   Doc # 38   Filed 07/27/11   Pg 6 of 50   Pg ID 1543

affidavit or offer of proof regarding the facts to be established at the hearing." MCR 7.211(C)(1)(a).

The Court of Appeals denied the motion to remand. *See People v. Hale,* No. 234038 (Mich. Ct. App. Dec. 10, 2002). Two days later, it affirmed Petitioner's conviction and sentence. *See People v. Hale,* No. 234038, 2002 WL 31953819 (Mich. Ct. App. Dec. 13, 2002).

The Petitioner sought leave to appeal both the denial of his appeal and the denial of his motion to remand to the Michigan Supreme Court. The Michigan Supreme Court denied Petitioner leave to appeal. *See People v. Hale,* 469 Mich. 861 (2003).

Petitioner then filed a motion for relief from judgment in the trial court, raising multiple claims, including the claims currently before the Court.

The trial court denied this motion, ruling that Petitioner failed to meet the requirements of MCR 6.508(D).[1] *See People v. Hale,* No. 00-008301-01 (Wayne County, Mich., Cir. Ct. Apr. 26, 2005). The trial court said the Michigan Court of Appeals had already denied his ineffective assistance of trial counsel claim in its

---

[1] MCR 6.508(D) states in part: The defendant has the burden of establishing entitlement to the relief requested. The court may not grant relief to the defendant if the motion . . . (2) alleges grounds for relief which were decided against the defendant in a prior appeal or proceeding under this subchapter, unless the defendant establishes that a retroactive change in the law has undermined the prior decision;
(3) alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence or in a prior motion under this subchapter, unless the defendant demonstrates (a) good cause for failure to raise such grounds on appeal or in the prior motion, and (b) actual prejudice from the alleged irregularities that support the claim for relief. . . . .

Page 6 of  50

unpublished opinion on December 13, 2002, and that appellate counsel raised the claim
in Petitioner's appeal of right.  The trial court denied relief under MCR 6.508(D)(2)
because no retroactive change in the law undermined the prior decision of the Court of
Appeals.

This conclusion is only partially correct; the Court of Appeals' December 13
decision did not address an ineffective assistance claim on the grounds of failure to
investigate or call an alibi witness.  Instead, Petitioner presented this issue only in his
motion to remand, which the Court of Appeals denied in a summary order without any
reasoning on December 10, 2002.

Despite finding that the issue had already been decided by the Appeals Court,
the trial court stated that it reviewed the record, found no meritorious constitutional
claims, and declined to "second guess the strategies that either trial or appellate
counsel employed."  *Id.* at 1-2.

Petitioner filed an application for leave to appeal the motion for relief from
judgment in the Michigan Court of Appeals, again raising the claims before the Court.
The Michigan Court of Appeals dismissed this application, finding that it was a
successive motion. *See People v. Hale,* No. 263293 (Mich. Ct. App. June 30, 2005).
Upon review, the Michigan Supreme Court reversed and remanded to the Court of
Appeals because it was not a successive motion. *See People v. Hale,* 474 Mich. 930
(2005).

The Michigan Court of Appeals considered and denied Petitioner's application

because Petitioner failed to meet his burden to establish entitlement to relief under MCR 6.508(D). *People v. Hale,* No. 263293 (Mich. Ct. App. Feb. 10, 2006).  Petitioner sought leave to appeal to the Michigan Supreme Court but it was denied. *See People v. Hale,* 476 Mich. 864 (2006).

Next, Petitioner filed a motion for new trial in the trial court, raising grounds not currently before this Court.  On April 24, 2007, the trial court denied the motion, concluding that Petitioner's claims should have been raised on direct appeal and were without merit.  *See People v. Hale,* No. 00-8301-01 (Wayne County, Mich., Cir. Ct. Apr. 24, 2007).  Both the Michigan Court of Appeals and Michigan Supreme Court denied Petitioner leave to appeal, finding that the motion for new trial was a successive motion for relief from judgment. *See People v. Hale,* No. 279956 (Mich. Ct. App. Sept. 13, 2007); *People v. Hale,* 480 Mich. 1009 (2008).

On June 5, 2007, Petitioner filed a petition for habeas corpus in this Court.

## III.   ANALYSIS

Petitioner claims that his trial counsel, Deborah Ford, was ineffective because she failed to adequately investigate and call alibi witness Demetria Young.  Respondent says these claims are barred from review because they are procedurally defaulted.  The Court agrees with Petitioner.

### A.    Procedural default

Under the procedural default doctrine, when "a state prisoner has defaulted his

federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default, and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750 (1991).  Procedural default may occur when a prisoner fails to present an issue to a state appellate court at his only opportunity to do so. *Rust v. Zent,* 17 F.3d 155, 160 (6th Cir. 1994).  However, "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on the procedural bar." *Harris v. Reed,* 489 U.S. 255, 263 (1989) (internal quotes omitted).

### (1). Determining Which Rule the State Court Judgment Rests Upon

Respondent says that the claims before the Court are procedurally defaulted because Petitioner first raised the claims in a motion for relief from judgment, which was denied pursuant to MCR 6.508(D).  Petitioner appears to concede that he first raised the claims in a motion for relief from judgment; however, Petitioner argues he can show that the default must be excused.  Both parties are mistaken.

The parties are correct that Petitioner did not raise these claims in his brief supporting his appeal. *See People v. Hale,* 2002 WL 3195381 (Mich. Ct. App. Dec. 13, 2002).  Although he raised other grounds for ineffective assistance of trial counsel, he did not raise an ineffective assistance claim on the grounds now before the Court. Therefore, he did not fairly present the claims currently before the Court in his appeal

brief. *See Caver v. Straub*, 349 F.3d 340, 346-47 (6th Cir. 2003) ("Thus, to the extent that an ineffective assistance of counsel claim is based upon a different allegedly ineffective action than the claim presented to the state courts, the claim has not been fairly presented to the state courts.").

Instead, Petitioner first raised the claims in a motion to remand filed in the Michigan Court of Appeals while his direct appeal was pending.  This motion asked the appeals court to remand the case to the trial court so that the trial court could conduct an evidentiary hearing on several claims, including the ones now before the Court.  The Court of Appeals denied this motion on December 10, 2002, stating: "The Court orders that the motion to remand is denied."   Three days later, on December 13, 2002, the Court of Appeals denied Petitioner's appeal in its entirety.

The Petitioner appealed both the denial of his appeal and the denial of his motion to remand to the Michigan Supreme Court. The Michigan Supreme Court issued an order dated July 28, 2003, stating: "On order of the Court, the delayed application for leave to appeal the December 13, 2002 judgment of the Court of Appeals is considered, and it is DENIED, because we are not persuaded that the questions presented should be reviewed by this Court."   The supreme court did not directly address, in this order or any other, the December 10, 2002 motion to remand.

Petitioner next filed a motion for relief from judgment with the trial court, again raising the claims currently before this Court.  The trial court denied the motion, but addressed only Petitioner's failure to call an alibi witness claim and his appellate ineffectiveness claim; the trial court did not address Petitioner's claim that his trial

attorney failed to investigate the alibi witness.[2]

The trial court wrote that the Michigan Court of Appeals already addressed and rejected the failure to call claim on Petitioner's appeal of right in its December 13, 2002 order.

The trial court denied relief pursuant to MCR 6.508(D)(2), because Petitioner failed to establish any retroactive change in the law that would change the outcome of the Court of Appeals' decision.  As discussed above, the trial court incorrectly referenced the December 13 order instead of the order denying the motion to remand, which was addressed in the December 10th order only.

However, the parties and the Magistrate fail to acknowledge Petitioner's motion to remand, and mistakenly state that Petitioner first raised the claims now before the Court in his motion for relief from judgment.  Respondent says that the trial court denied the claims pursuant to MCR 6.508(D)(3), because Petitioner did not establish good cause for failing to raise these issues in his appeal of right.

The Court reads the trial court's order differently. The trial court specifically denied Petitioner's ineffective trial counsel claim under MCR 6.508(D)(2).  The trial court denied Petitioner's *other* claims in the motion for relief from judgment under MCR 6.508(D)(3); however, those claims are not now before the Court.

Moreover, the trial court was not mistaken when it relied on MCR 6.508(D)(2).

---

[2] Despite the trial court's failure to address this claim, Petitioner's motion for relief from judgment fairly raises a failure to investigate claim with respect to Demetria Young.

Although Petitioner did not raise these claims in his appeal brief, he did raise them in his motion to remand.  The Sixth Circuit holds that raising a claim in a motion to remand properly presented to the Michigan courts is sufficient to fairly present the claims within it to the state courts, because this is "a procedurally proper approach to securing review of the issues," whether they were presented in the appeal brief or not.  *Elmore v. Foltz,* 768 F.2d 773, 775 (6th Cir. 1985)*; Cottenham v. Jamrog,* 248 Fed. Appx. 625, 633-34 (6th Cir. Aug. 21, 2007).

Because Petitioner fairly presented his claims to both the Michigan Court of Appeals and the Michigan Supreme Court, the trial court was not mistaken when it concluded that the Michigan Court of Appeals already considered and denied the claims, even if it was mistaken about the date of the decision.

### (2).  The Claims Are Not Procedurally Defaulted

Next, the Court must determine whether the trial court's reliance on MCR 6.508(D)(2) to bar consideration of the claims in the motion for relief from judgment renders the claims procedurally defaulted.  The Court concludes that it does not.

"A habeas petitioner procedurally defaults a claim if: (1) the petitioner fails to comply with a state procedural rule; (2) the state courts enforce the rule; (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim; and (4) the petitioner cannot show cause and prejudice excusing the default." *Guilmette v. Howes,* 624 F.3d 286, 290 (6th Cir. 2010).

Here, Petitioner does not meet the first element of the test; MCR 6.508(D)(2) is

not a procedural rule that presents an adequate bar to habeas review. *See Hicks v. Straub,* 377 F.3d 538, 558 n.17 (6th Cir. 2004).  Instead of a procedural bar, this rule "is a collateral estoppel rule which prohibits a trial court from reconsidering a claim already decided against a defendant on direct appeal." *Skinner v. McLemore,* 2011 WL 2192632 at * 3 (6th Cir. June 7, 2011).

"A claim is procedurally barred when it has not been fairly presented to the state courts for their initial consideration–not when the claim has been presented more than once." *Cone v. Bell,* 129 S.Ct. 1769, 1781 (2009).  Instead, "when a state court declines to revisit a claim it has already adjudicated, the effect of the later decision upon the availability of federal habeas is 'nil' because 'a later state decision based on ineligibility for further state review neither rests upon procedural default nor lifts a pre-existing procedural default.'" *Id.* (quoting *Ylst v. Nunnemaker,* 501 U.S. 797, 804 (1991). The invocation of this rule does not indicate that the claims are procedurally defaulted, but, to the contrary, shows they are ripe for federal review. *Id.*  Thus, the trial court's failure to review the merits of Petitioner's claims for the reason that the claims were already decided "creates no bar to federal habeas review." *Id.*

Petitioner's claims are not procedurally defaulted because they were fairly presented to the state court of appeals for consideration in the motion to remand, and appealed to the supreme court.  The fact that Petitioner presented these same claims in his motion for relief from judgment does not render them procedurally defaulted.

**B.      Standard of Review**

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs all habeas petitions filed after its effective date. *Lindh v. Murphy,* 521 U.S. 320, 326, 327 (1997).  Under AEDPA, in order to obtain habeas relief, a state prisoner must show that the state adjudication of the claim on the merits:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 413 (2000).  A decision is based on an unreasonable application of Supreme Court precedent "if the state court identifies the correct governing legal rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* Possible error by the state court is not sufficient to justify granting the habeas petition; the state court's application of federal law "must have been 'objectively unreasonable.'" *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (quoting *Williams*, 529 U.S. at 409).

However, § 2254(d) "by its own terms is applicable only to habeas claims that were 'adjudicated on the merits in State court . . . .'" *Maples v. Stegall,* 340 F.3d 433, 436 (6th Cir. 2003).  When a state court declines to address the merits of a habeas

petitioner's properly raised claim, federal habeas review is not subject to the deferential standard mandated in 28 U.S.C. § 2254(d). *See Cone v. Bell,* 129 S. Ct. 1769, 1784 (2009); *Evans v. Hudson,* 575 F.3d 560, 564 (6th Cir. 2009) ("When AEDPA deference does not apply, we apply the preAEDPA standard of review and review questions of law *de novo* and questions of fact for clear error.").

The parties do not contest the Magistrate's conclusion that § 2254(d) applies to Petitioner's ineffective trial counsel claims.  This is curious, given that the parties appear to assume that the state courts did not address the merits of Petitioner's claims due to a procedural bar.  "Nevertheless, a party cannot 'waive' the proper standard of review by failing to argue it." *Brown v. Smith,* 551 F.3d 424, 428 n.2 (6th Cir. 2008) (overruled on other grounds by *Cullen v. Pinholster,*131 S.Ct. 1388 (2011)).  This Court has a duty to determine and apply the appropriate standard of review in all cases.

Here, the Court of Appeals' order denying the motion to remand merely stated: "The Court orders that the motion to remand is denied."  Although this is a summary denial with no reasoning, the Court must presume that the state court adjudicated Petitioner's claims on the merits. *Harrington v. Richter,* 131 S.Ct. 770, 784 (2011) ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").  Because there is no indication that the state court's denial was not on the merits or was based on procedural rules, AEDPA deference applies to Petitioner's claims.

C.     **The Evidentiary Hearing &** *Cullen v. Pinholster*

The Court held an evidentiary hearing on December 8, 2010.   After the hearing, the parties filed supplemental briefs discussing the merits of the claims in light of the evidence submitted.

However, after the hearing and supplemental briefing were complete, the Supreme Court decided *Cullen v. Pinholster,* 131 S.Ct. 1388 (2011), which cast significant uncertainty on the role of federal evidentiary hearings in state habeas cases.

*Cullen* holds that federal court review of a claim governed by 28 U.S.C. § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.* at 1398. In other words, "evidence later introduced in federal court is irrelevant" to a federal court's review of a state court's merits based decision. *Id.* at 1400.  Thus, those seeking habeas relief in federal court "must overcome the limitation of § 2254(d)(1) review on the record that was before [the] state court." *Id.*

Although the full implications of *Cullen* are unclear, under this Court's reading of the case, the Court is required to ignore the evidence submitted at the hearing when determining whether Petitioner meets the standard set forth in 28 U.S.C. § 2254(d)(1).

Despite this, the Court believes that granting the evidentiary hearing was proper. Evidentiary hearings are governed by 28 U.S.C. § 2254(e)(2).  In an earlier decision, this Court decided that Petitioner was entitled to this hearing under § 2254(e)(2). Although *Cullen* certainly addresses how and when evidence may be considered, it did not decide or address when an evidentiary hearing is proper. *Id.* at 1411 n.20 ("[W]e

need not decide whether § 2254(e)(2) prohibited the District Court from holding the evidentiary hearing or whether a district court may ever choose to hold an evidentiary hearing before it determines that § 2254(d) has been satisfied.").  While *Cullen* seems to drastically limit the consideration of the evidence from the hearing, it did not decide that it was error to grant the hearing.

Moreover, that the Court may not consider the evidence when determining whether Petitioner meets § 2254(d)(1) does not mean that the evidence may not be used for any purpose.  However, the majority opinion for *Cullen* did not directly address the proper uses of evidence from a properly granted evidentiary hearing, although it suggested that some remain.

However, the majority made clear that a petitioner must show he is eligible for habeas relief under the rigorous standard set forth in 28 U.S.C. § 2254(d)(1) before evidence submitted in federal court may be considered. *See id.* at 1401 (28 U.S.C. § 2254(e)(2) "continues to have force where § 2254(d)(1) does not bar federal habeas relief").

Therefore, the Court must determine whether any of Petitioner's claims satisfy § 2254(d)(1) before determining whether, and in what capacity, it may consider evidence from the hearing.

**D.     The State Court's Decision Is an Unreasonable Application of Clearly Established Supreme Court Precedent Under § 2254(d)(1).**

### (1). Clearly Established Law

Petitioner argues that his trial counsel rendered constitutionally ineffective assistance in two ways: (1) by failing to conduct a reasonable investigation of his alibi witness; and (2) by failing to present his alibi witness at trial.  Petitioner also says that his appellate counsel was ineffective for failing to raise theses claims in his direct appeal.

The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const., amend. VI.  This Sixth Amendment right to counsel is the right to effective assistance of counsel. *See Strickland v. Washington,* 466 U.S. 668, 685 (1984).

The United States Supreme Court set forth a two part test for determining whether a habeas petitioner received constitutionally ineffective assistance of counsel in *Strickland v. Washington*.  First, Petitioner must prove that his attorney's performance was deficient. *Strickland*, 466 U.S. at 687.  An attorney's performance is deficient if it "fell below an objective standard of reasonableness."  *Id.* at 688.  That is "reasonableness under prevailing professional norms." *Id.*

> [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland,* 466 U.S. at 690-91.

However, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690.

Nevertheless, "[j]udicial scrutiny of counsel's performance must be highly deferential," and includes "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.   "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690.

 Second, Petitioner must show he was prejudiced by this deficiency.  *Strickland*, 466 U.S. at 692.  To prove prejudice, Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  However, Petitioner does not have to show "that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693.

### (2). *Strickland* and 28 U.S.C. § 2254(d)

Because the Court must give deference to the state court's decision under § 2254(d), "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter,* 131 S.Ct. 770, 785 (2011).  "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id.* at 788 (citations omitted).

"Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.  This is so whether or not the state court reveals which of the elements in a multipart claim it found insufficient . . . ." *Id.* at 784.

"Under § 2254(d), a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* at 786. If fairminded jurists could disagree, then the state court's application of *Strickland* was not unreasonable.

### (3). Petitioner's Claims

Petitioner argues that trial counsel performed deficiently because she failed to investigate and call his alibi witness.  The Court agrees.

### *a. Interpreting Strickland*

It is well established that under *Strickland* counsel has a duty to conduct a reasonable investigation into the facts of a defendant's case, or to make a reasonable determination that an investigation is unnecessary. *See Wiggins v. Smith,* 539 U.S. 510, 522-23 (2003).  This "includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence." *Towns v. Smith,* 395 F.3d 251, 258 (6th Cir. 2005).

Moreover, there is "no question that the failure to reasonably investigate potentially exculpatory witnesses satisfies the deficiency prong of the *Strickland* test." *Clark v. Redman,* 865 F.2d 257 (6th Cir. 1988).

"The focus in failure-to-investigate claims, then, is the reasonableness of the investigation (or lack thereof)." *English v. Romanowski,* 602 F.3d 714, 726 (6th Cir. 2010).  Therefore, the relevant issue before the Court "is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega,* 528 U.S. 470, 481 (2000).

Furthermore, while decisions as to what evidence to present and whether to call certain witnesses are generally presumed to be matters of trial strategy, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on the investigation." *Strickland,* at 690-91; *see also Caldwell v. Lewis,* 2011 WL 915764 (6th Cir. March 16, 2011) (counsel was ineffective for failing to call alibi witness promised in opening statement where his only justification for not doing so was that he believed he had completely discredited one of the prosecution's two main witness on cross examination).

### *b. The State Court's Decision that Trial Counsel Was Not Deficient Is an Unreasonable Application of Strickland*

Because the state court did not explain the reasons for denying this claim, the Court "must determine what arguments or theories supported, or . . . could have

supported, the state court's decision," and "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding" of *Strickland. Harrington,* 131 S.Ct. at 786.  If there is any reasonable argument that "reasonable professional judgments support the limitations on [Ford's] investigation," Petitioner's claim must fail. *Strickland,* 466 U.S. at 691.

Additionally, the Court must determine whether there is any reasonable argument that counsel's decision not to call Young, made after an insufficient investigation, was a reasonable professional judgment. If there exists a reasonable argument that Ford's decision was a reasonable professional judgment, Petitioner's claim must fail.

After reviewing the record and relevant evidence before the state court, the Court can find no reasonable argument, under the facts known at the time, that the limitation on the investigation into Petitioner's alibi witness was the result of reasonable professional judgment.  Ford's failure to conduct a reasonable investigation of a known alibi witness fell below an objective standard of reasonableness, and the state court's decision concluding otherwise is an unreasonable application of *Strickland*.

Furthermore, the Court can find no reasonable argument that Ford's decision not to call Young, which was made after an objectively unreasonable investigation, was the result of reasonable professional judgment.  Instead, Ford chose to abandon any investigation into the alibi witness "at an unreasonable juncture, making a fully informed decision . . . impossible." *Wiggins v. Smith,* 539 U.S. 510, 528 (2003). Ford's failure to conduct a reasonable investigation of a known alibi witness rendered her failure to call

the alibi witness a mere result of her own lack of preparation and investigation, not a reasonable, tactical choice. This violated Petitioner's Sixth Amendment right to the effective assistance of counsel, and the state court's decision concluding otherwise is an unreasonable application of *Strickland*.

To reach this determination, the Court considers only the relevant evidence before the state court.  This includes the affidavit of Demetria Young that Petitioner filed in support of his motion to remand.  It says that Petitioner and Young went to a club together for a date the night before the murder.  They left the club together early the next morning (around 1:00 a.m.) and went to Young's house, where they spent the night together.  Young says Petitioner stayed there with her continuously through the morning and until about 3:00 p.m.   Because the murder occurred that morning between 10 and 12 a.m. at a different location, if Young were to be believed, Petitioner could not have committed the murder.

In the affidavit, Young also says she approached Petitioner's attorney at a court hearing and told her that Petitioner was with her during the time of the murder.  Young says his attorney told her that she was not needed, and Young was never contacted about the case.

Also in the state court record is a witness list and notice of alibi filed by Ford sometime after the calendar conference.  The witness list names Young as the first witness.  The notice of alibi says that Petitioner was with Young at her home at the time of the shooting.

Also before the state court were Petitioner's representations in his motion to remand. He says that he told Ford about Young "well before the start of trial." Mot. at 8.

The record also includes the following conversation between the Petitioner, his trial counsel, and the trial judge during the trial after the prosecution rested:

**MS. FORD**: I filed a witness list on my client, two of them. I have my investigator sitting to my right, Terry Feys.

.   .   .

**MS. FORD**: My client did ask for some witnesses. We both tried to find them. I have subpoena forms here. My file, I was ready, willing, and able to subpoena people. It was based on my determination that they didn't want to be here. So, we come up blank. Blank faces, blank answers. So, that's why I didn't do that. Mr. Hale, you understand that, right?

**DEFENDANT**: Yes, ma'am.

**MS. FORD**: I'm referring particular to Brenda Hill and – it's really Lavon Hill. You understand that, right?

**DEFENDANT**: Yes, ma'am.

**MS. FORD**: That's why they're not here. You agree with the reason.

**DEFENDANT**: Yes, ma'am.

**MS. FORD**: There were others, and I'm not going to go through the whole list.

.   .   .

**MS. FORD**: There was alibi, there were people in the discovery –

**THE COURT**: Alright.

**MS. FORD**: For a variety of reasons, either through the unavailability, [un]willingness, or change in theory between my client and I, they're not here.

Page 24 of 50

| | |
|---|---|
| **THE COURT**: | Very well. |

.   .   .

| | |
|---|---|
| **THE COURT**: | So, you've had a chance to go through that with your client – |
| **MS. FORD**: | We've been through everything. |

.   .   .

| | |
|---|---|
| **MS. FORD**: | Is that right? |
| **DEFENDANT**: | Yes, ma'am. |

Trial Tr., dated January 30, 2001, at 161-163.

At Petitioner's sentencing, the following conversation occurred between

Petitioner, his trial counsel, and the trial judge:

| | |
|---|---|
| **DEFENDANT**: | I had witnesses that was[sic] willin' to come to court and for some apparent reason, my lawyer took it upon herself not to call 'em.  I don't know what the reason– |
| **THE COURT**: | Who are these persons?  Name them for me and what they would have testified to. |
| **DEFENDANT**: | My alibi witness, Miss Demetria Young, would have testified that I was with her the day that this crime was committed. |
| | And I informed my lawyer of that, and when her and my friend met in the courtroom, they had differences, for whatever reasons it was, I don't know.  But Miss Ford didn't like her attitude for some reason, and that's the reason why Miss Ford failed to call her to come testify. |

.   .   .

| | |
|---|---|
| **MS. FORD**: | And why his fiancé didn't come – he's referring to something, a conversation he wasn't privy to with the fiancé on the calendar conference date, why his lover didn't come to court on his trial date befuddles me.  I mean, she's mad at me and she stands up her man, that's a new one on me. |

> But I'll talk further if there's a Ginther Hearing.
>
> He and I had agreed not to do the alibi[.]

**DEFENDANT**:   She agreed.  I didn't agree.

**MS. FORD**:   He agreed.

**DEFENDANT**:   That was my alibi witness.  I didn't agree on nothin'.

                          .        .        .

**DEFENDANT**:   She had a problem with my alibi witness coming out the gate when they first met.  She told me this, personally, that I don't like your girl 'cause she think I want you or somethin' like that, and I don't want to call her to court.

                          .        .        .

**DEFENDANT**:   This is, you know what I'm sayin', this is one of my witnesses that had the jury . . . heard her testimony might have had differences on finding me guilty sayin' that I was with her, even if they don't believe her or did believe her, this would have put a reasonable doubt in the jury mind.

Sentencing Tr., dated March 8, 2001, at 9-12.

It is unclear from the January 30, 2001 trial transcript, why Ford failed to call Young.  Ford did not refer to each witness by name whom she would not call, nor did she specify the reason that each would not be called.  Ford stated that some would not be called because they didn't want to come to trial, she couldn't find them, they were unavailable or because of trial strategy.

However, in the March 8, 2001 sentencing transcript, Ford says she did not call Young because she and Defendant agreed not to put on an alibi defense.  Ford did not say that Young could not be found, didn't want to come to court, or was unavailable. Ford confirmed that she spoke with Young at the calendar conference (which was held

on August 25, 2000), but did not mention whether she attempted to speak with her at any point afterwards.  Ford said that Petitioner agreed with her decision not to put on an alibi defense.  Petitioner told the court he had not agreed.

Because the state court did not explain its denial of Petitioner's failure to investigate claim, the Court must determine what arguments or theories may have supported the state court decision, and see whether those theories are consistent with Supreme Court precedent.

It is undisputed that the evidence before the state court establishes that Ford knew of Petitioner's alleged alibi witness and his desire (at least initially) to mount an alibi defense.  The evidence also shows that Ford and Young spoke on one occasion, after a calendar conference approximately five months before the beginning of Petitioner's trial.  And, according to Young's affidavit, the content of which is not called into question by any other facts in the state court record, in the five months leading up to trial, Ford never contacted or interviewed Young.  None of the facts indicates that Ford made any attempt, but was unable, to contact or investigate Young, or that Ford had any reason to believe, based on Petitioner's statements or actions, that an investigation into Young would be "fruitless or even harmful." *Strickland,* at 691.

Under these facts, it appears that the state court must have determined that it was either not deficient performance for an attorney to fail to interview or investigate a known alibi witness, or that Petitioner was not prejudiced by this deficiency.  If so, this was an unreasonable application of *Strickland*.

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 690-91.  Failure to investigate an alibi witness, when the alibi witness offered to testify on the defendant's behalf, is objectively unreasonable. *See Poindexter v. Booker,* 301 Fed. Appx. 522, 528-529 (6th Cir. 2008) (where alibi witnesses approached trial counsel, and trial counsel was not receptive or interested in their testimony, and did not investigate the alibi witnesses further, trial counsel's investigation was objectively unreasonable); *Avery v. Prelesnik,* 548 F.3d 434, 437-438 (6th Cir. 2008) (where trial counsel's only attempt to contact alibi witness was through an investigator who left it up to the witness to contact counsel, and trial counsel never personally attempted to contact the witness, trial counsel's investigation was objectively unreasonable, because at "bare minimum" counsel should put forth a reasonable effort to contact witnesses).

Here, after one brief, in court meeting, initiated by the witness, Ford apparently made no investigation into Young.  "A purportedly strategic decision is not objectively reasonable 'when the attorney has failed to investigate his options and make a reasonable choice between them.'" *Towns v. Smith,* 395 F.3d 251, 258 (6th Cir. 2005) (quoting *Horton v. Zant,* 941 F.2d 1449, 1462 (11th Cir. 1991)).

Moreover, even if the state court believed that Petitioner agreed with Ford's decision not to investigate Young, as Ford said Petitioner did, this does not mean that Ford's failure to investigate was objectively reasonable.  *See Ward v. United States,* 995 F.2d 1317, 1321-22 (6th Cir. 1993) (Defendant's acquiescence to trial counsel's performance should not inform *Strickland* analysis, which is "judicial evaluation of

counsel's performance in accordance with an objective standard of reasonableness as measured against the prevailing norms of the legal community."). Based on the evidence the state court had before it, Ford neither had the information she needed to make a reasonable decision not to investigate, nor was informed enough to advise Petitioner that his alibi defense should be abandoned.

Without creating additional facts which were not in the state court record, the Court fails to see any arguments or theories which show the state court's decision on this issue was reasonable. Counsel's conduct fell below an objective standard of reasonableness, and it was an unreasonable application of *Strickland* for the state court to decide otherwise.

Furthermore, Ford's deficient investigation rendered her decision not to call Young objectively unreasonable; she had no reasonable basis upon which to make this decision.

Generally speaking, deciding not to present a specific defense or witness in support is a strategic decision that, if reasonable, amounts to sound trial strategy; here, however, there are no facts indicating how Ford came to the conclusion that this strategy was reasonable without at least interviewing Young. And, even if the state court theorized that Petitioner agreed to this strategy, it is unclear how Ford could have fully informed her client of the potential risks of an alibi defense if she failed to fully investigate it.

There are simply no facts in the state court record that show Ford investigated, in any capacity, a known alibi witness; that her client may have agreed with this strategy does not render her performance any less deficient under *Strickland's* objective reasonableness standard.  The decision, and advice, was simply uninformed.  "A purportedly strategic decision is not objectively reasonable 'when the attorney has failed to investigate his options and make a reasonable choice between them.'" *Towns v. Smith,* 395 F.3d 251, 258 (6th Cir. 2005) (quoting *Horton v. Zant,* 941 F.2d 1449, 1462 (11th Cir. 1991)).

In the trial transcript, Petitioner appears to agree with Ford's unclear and unexplained reasons for not presenting witnesses.  Even if he did, however, this does not mean those reasons, or the decision itself, were justified.  And, Petitioner was not in a position to determine whether Ford's representations and performance were objectively reasonable or not. *See Ward v. United States,* 995 F.2d 1317, 1321-22 (6th Cir. 1993).

It is difficult for this Court to identify any theory or argument under the facts before the state court which shows that the state court's decision was a reasonable application of Supreme Court precedent.

If the facts alleged by Petitioner are true, the state court unreasonably applied *Strickland* under 28 U.S.C. § 2254(d)(1) on both claims, when deciding that Ford's performance was not deficient.

***c. The State Court's Decision that Petitioner Was Not Prejudiced by Trial Counsel's Deficient Performance Is an Unreasonable Application of Strickland***

The Court finds that if the facts alleged by Petitioner are true, trial counsel's performance was deficient in both failing to investigate and call an alibi witness. Petitioner must now show that he was prejudiced by this deficient performance, and that the state court's decision to the contrary was objectively unreasonable.

To prove prejudice, Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland v. Washington*, 466 U.S. 668, 694 (1984).  "[A] 'reasonable probability' does not mean a certainty, or even a preponderant likelihood, of a different outcome, nor even more, that no rational juror could constitutionally find [the defendant] guilty."  *Matthews v. Abramajtys*, 319 F.3d 780, 790 (6th Cir. 2003) (internal citation omitted).

Because the state court did not give reasons for its denial of Petitioner's claims, the Court assumes that the state court believed the deficiencies identified above were not prejudicial to Petitioner; however, there is no reasonable argument that the failure to investigate and call an alibi witness was not prejudicial to Petitioner.  To the extent the state court ruled otherwise, it unreasonably applied *Strickland*.

"To evaluate a claim of prejudice, the court must assess how reasonable jurors would react to the additional alibi testimony had it been presented." *Avery v. Prelesnik,*

548 F.3d 434, 439 (6th Cir. 2008).  However, the Court does not decide whether the jury would be likely to believe the testimony of the alibi witness because "our Constitution leaves it to the jury, not the judge, to evaluate the credibility of witnesses in deciding a criminal defendant's guilt or innocence." *Ramonex v. Berghuis,* 490 F.3d 482, 490 (6th Cir. 2007).  Instead, the Court determines whether Young's testimony, if believed, undermines confidence in the jury verdict.

First, it is important to note that Petitioner always maintained his innocence, there was no physical evidence linking him to the crime, and his trial counsel argued in her closing statement that Petitioner simply was not present during the murder.  Second, the only evidence linking Petitioner to the crime was the testimony of two eyewitnesses. One of the eyewitnesses died before trial and was, at least for a time, a suspect in the crime.  The other had a stake in Petitioner's conviction–namely, that the witness's own prison sentence would be reduced.

Finally, the evidence the jury would have heard was not cumulative.  The jury was presented with absolutely no evidence of Petitioner's alibi.[3]  Evidence that Petitioner was not present during the commission of the crime is a complete defense to the charge of felony murder, which the jury had no opportunity to consider.  There is at least a reasonable probability that the result of the trial would have been different had counsel presented this alibi witness.

---

[3] In fact, Ford declined to call any witnesses to testify on Defendant's behalf.

The facts before the state court, if true, show that Ford's performance violated Petitioner's right to effective assistance of counsel.  The state court's ruling to the contrary was an unreasonable application of *Strickland.*

Twenty Eight U.S.C. § 2254(d)(1) does not bar habeas relief.

**E.    Consideration of Evidence from the Federal Court Evidentiary Hearing Is Appropriate**

Because 28 U.S.C. § 2254(d)(1) does not bar federal habeas relief, the Court must next determine whether, and to what extent, the evidence submitted at the evidentiary hearing should be considered by the Court.

In *Cullen,* the majority stated that § 2254(e)(2) "continues to have force where § 2254(d)(1) does not bar federal habeas relief."  *Cullen v. Pinholster,* 131 S.Ct. 1388, 1401 (2011). This includes, "[a]t a *minimum*," when the claims were not decided by the state court on the merits. *Id.* (emphasis added).  However, the majority did not specify any other situations where evidence submitted at an evidentiary hearing pursuant to § 2254(e)(2) might be properly considered.

Justice Breyer, concurring in part and dissenting in part, wrote separately to shed some light on how §§ 2254(d)(1) and 2254(e)(2) work in the wake of *Cullen.*  He stated:

> If the state courts reject the claim, then a federal habeas court may review that rejection on the basis of the materials considered by the state court. If the federal habeas court finds that the state-court decision fails (d)'s test (or if (d) does not apply), then an (e) hearing may be needed.  *Id.* at 1412.

Breyer went on to explain some situations in which consideration of evidentiary

hearing evidence may be necessary:

> For example, if the state-court rejection assumed the habeas petitioner's
> facts (deciding that, *even if* those facts were true, federal law was not
> violated), then (after finding the state court wrong on a (d) ground) an (e)
> hearing might be needed to determine whether the facts alleged were
> indeed true. Or if the state-court rejection rested on a state ground, which
> a federal habeas court found inadequate, then an (e) hearing might be
> needed to consider the petitioner's (now unblocked) substantive federal
> claim.  Or if the state-court rejection rested on only one of several related
> federal grounds (*e.g.,* that counsel's assistance was not "inadequate"),
> then, if the federal court found that the state court's decision in respect to
> the ground it decided violated (d), an (e) hearing might be needed to
> consider other related parts of the whole constitutional claim (*e.g.*, whether
> the counsel's "inadequate" assistance was also prejudicial). There may be
> other situations in which an (e) hearing is needed as well. *Id.*

The Court finds Justice Breyer's explanation persuasive and his examples

particularly illustrative.

It is impossible to discern why the state court rejected Petitioner's habeas claims;

however, the state court did not appear to deny the claim based on a procedural rule or

other state ground.  Instead, it appears that the state court decided that even if the facts

Petitioner stated were true, his counsel was not ineffective.  Again, it is impossible to

determine which prong of the *Strickland* test the state court concluded Petitioner failed

to satisfy–or whether the state believed he failed to satisfy both.  For this reason, in the

Court's § 2254(d)(1) analysis above, the Court assumed the state court determined that

Petitioner could satisfy neither prong.

Justice Breyer suggests that, because the state court's decision was an

unreasonable application of *Strickland* under § 2254(d)(1), an evidentiary hearing may

be necessary to decide whether these facts are true.  Accordingly, the Court reviews the testimony from the evidentiary hearing to decide if it supports the facts underlying Petitioner's claim.

### F.    The Evidentiary Hearing

Petitioner testified on his own behalf and presented two other witnesses: trial counsel, Deborah Ford; and his alleged alibi witness, Demetria Young.  Petitioner waived his attorney/client privilege for purposes of the hearing.

### (1).  Petitioner's Trial Counsel Deborah Ford

Ford testified that she had an "extremely high" independent recollection of the case, and estimated it to be at 80-90% before she reviewed the case file. Tr. 6, Dec. 8, 2010.  Ford considered herself a very experienced trial attorney at the time of Petitioner's trial, and said she had taken first degree murder cases to trial many times. *Id.*

Petitioner retained Ford to represent him after his preliminary examination in July of 2000. *Id.*  Ford visited Petitioner in jail.  She did not ask him whether he committed the murder, but he told her he did not.  He also told her he had witnesses he wanted her to interview. *Id.* at 9-10.  He told her he was at the Zodiac Club the night before the murder.  However, Ford said that Petitioner's explanation of where he was during the time of the murder changed: Ford testified that Petitioner also told her he was with his

girlfriend Demetria Young, but also that he was at Brenda Hill's[4] house. Ford said she asked her investigator, Terry Feys, to help her determine whether any of Petitioner's claims could be confirmed. *Id.* at 11.

Ford said she filed two witness lists. On the first, Ford attached a notice of alibi, identifying Demetria Young as an alibi witness. *Id.* at 12. Ford testified that it was part of her pattern to file a notice of alibi whenever there was a possibility that one existed, because she did not want to later miss the filing deadline. She never amended or withdrew the notice of alibi. *Id.* at 14.

When asked what she did to locate these witnesses, Ford said she deferred to her investigator. She testified she did not have a written report of his investigation, but she described the witnesses as "quite illusive." *Id.* at 13. When asked about her success in locating witnesses, Ford said: "Well, it was hard because they were illusive to find . . . . I spoke to Demetria Young in court. Terry Feys– I have in my grievance response, I said he had a hard time locating her and getting her to respond and to call back and to sit down and talk. I saw her in court, but as I recall it was just illusive and vague; nothing that I felt that I could put a whole theory of defense on a murder case. Particularly when Hale also had told me himself he had been at Anita [sic] Hill's house that morning; he told me that. So there were revolving defenses." *Id.* at 13.

Ford said she spoke with Young only at the final conference on August 25, 2000. *Id.* at 15. Ford testified that neither she nor her investigator ever obtained Young's

---

[4] Throughout the hearing, Brenda Hill is also referred to as Cynthia Hill. Additionally, Ford often called Ms. Hill "Anita."

address or telephone number. *Id.* at 15.  She said she asked Petitioner for Young's address and phone number, but he did not provide either. *Id.* at 16.  However, the notice of alibi Ford filed stated Young "lived on Prairie just East of Mack in the City of Detroit."  Later, Ford admitted that she had Young's phone number, but claimed her investigator said he was never able to reach Young. *Id.* at 17.  According to Ford, Young never answered when the investigator called. *Id.* at 21.  Ford said she did not remember whether she ever called Young personally. *Id.* at 22.

Petitioner's attorney asked Ford if Young told Ford she was with Petitioner at the Zodiac Club during the evening before the murder, and continuously through much of the next day (the day of the murder).  Ford testified that she remembered Petitioner telling her that, but that she did not recall Young saying it. Ford said she was unable to pin down specifics with Young, and believed she was not credible. *Id.* at 19.  However, she said she did not remember the exact reason she believed Young was not credible, but that "either she couldn't give [Ford] her address or the exact time." *Id.* at 19.  Ford described Young's statement as "fuzzy and hazy." *Id.* at 19.

However, Ford later testified that Petitioner told her he had been to Hill's house the morning of the murder, and that was why she did not believe Young. *Id.* at 30. She said she did not call Young as a witness because she refused to let Young perjure herself. *Id.* at 30-31.  Ford testified that she did not even tell Young when the trial was set to begin (although she said Young knew because she was at the calendar conference when the date was set). The calendar conference was five months before the trial began.

Ford said was not sure whether she asked Young to testify at the trial, but said it would be typical for her to ask.  Ford said her investigator tried to ask Young to testify, but he was never able to contact Young.  *Id.* at 23.  Ford said she did not subpoena Young to come to trial because she did not think she ever got  "a hard address" for Young. *Id.* at 24.

Ford testified that she did not remember asking Young to sign a written statement, and she first saw Young's affidavit the day of the evidentiary hearing. *Id.* at 51-52.

Ford testified that Petitioner knew before trial that Young would not be called. *Id.* at 27.  Ford said this was not a change in strategy, because calling Young had never been a part of the strategy. *Id.*  However, Ford later testified that she had fluctuating theories, that there were at least four different strategies. *Id.*  Ford also testified that she told Petitioner this strategy before trial.  She was not sure when, but she went to the jail the week before trial. *Id.* at 39.  However, Ford was unclear on whether she told Petitioner that Young was unavailable, or that she believed Young was lying. *Id.* at 38-39.  When asked whether Petitioner had objections to Ford's decision not to call Young, she said: "Not between us by the end of the trial, meaning by the end as you're ready to go in, no he did not object nor did he object on the record prior to the conviction. No." *Id.* at 34.

Ultimately, Ford testified that Young was unavailable and would have committed perjury. *Id.* at 37-38.  Despite her testimony that Young would commit perjury on the

stand, Ford said if Petitioner had "forced" her to put Young on the witness stand, she would have made a statement on the record that it was against counsel's advice, and would have called Young.  *Id.* at 35.

Ford testified her strategy at trial was to impeach the credibility of the eye witnesses, and to raise doubt concerning the accuracy of their identification of Petitioner.  *Id.* at 25-26.  During her closing, Ford told the jury Petitioner was never at the scene.  *Id.*  Young's testimony would have been the only testimony to support this.

### (2).  Petitioner Jerome A. Hale

 Petitioner testified that at the time of the murder in 1999, he and Demetria Young had been dating for about 8 or 9 months. *Id.* at 53.  They spent a lot of time together, and they usually went to the Zodiac Club on the weekends. *Id.* at 54. He said they always left together. *Id.*

Petitioner said he told Ford he was at the Zodiac Club with Young the evening before the murder, and that he was with Young during the time of the murder. *Id.* at 55. He told Ford that individuals at the club could corroborate that he was there, and Young was willing to testify that he was with her at her house during the time of the murder. *Id.* Petitioner also told Ford that Lavon Hill and Cynthia Hill should be witnesses, because their house neighbored the crime scene. *Id.* at 56.  However, Petitioner testified that the only witness who could provide an alibi for him was Young, and that he never told Ford otherwise. *Id.*  He said he never told Ford different versions of where he was the day of the murder. *Id.* at 73.

Petitioner testified that he gave Ford a list of witnesses the first time she met with him at the jail, which she wrote down. *Id.* at 68.  He said he gave her the addresses and phone numbers of almost all the witnesses, including Young. *Id.*  He reiterated that he only had one alibi witness, and that was Young. *Id.* at 69.

Ford told Petitioner that she had spoken with Young. *Id.* at 60.  He said Ford indicated that she and Young had a personality conflict during this conversation. *Id.* Petitioner testified Ford never told him that she did not believe Young or that she was not going to use Young as a witness. *Id.* at 61.  Ford never discussed with him her belief that Young was lying. *Id.* at 81.  He said he did not know his witnesses were not going to be called until the trial was over.  He testified that he thought his witnesses were being sequestered out in the hall during the trial. *Id.* 61.

Petitioner said it was his understanding that Ford was pursuing an alibi defense on his behalf. *Id.* at 58.  He said Ford never discussed a change in this strategy with him before trial. *Id.*  He also said that they never discussed abandoning any of his witnesses before trial. *Id.*  Petitioner said Ford did not question Young's credibility, and, in fact, told him Young was more credible than the witnesses who identified him as the shooter.  According to Petitioner, Ford said it was a matter of the eyewitnesses' testimony against Young's. *Id.* at 58-59.

When asked about the trial transcript, when Ford put on the record that she was not going to call witnesses, and Petitioner appeared to agree, Petitioner said he believed she was indicating that she was not going to call Lavon Hill and Brenda Hill.

He said he was in agreement with that, because Ford said she could not locate them. *Id.* at 62.  However, he testified that he did not agree that Ford not call Young. *Id.* at 63.

Petitioner did not tell the trial court his concerns with Ford until after his conviction. *Id.* at 66-67.  He said he did not speak up because Ford told him not to speak during the trial unless he was spoken to. *Id.* at 67.  He said, "I was ignorant to the fact . . . that I could just stand up and blurt out in the courtroom that hey, my lawyer didn't do what she's supposed to until the Judge gave me the opportunity to speak . . . ." *Id.*  He said Ford told him to only address the court when the court addressed him. *Id.* He said the first time court asked him to speak was at sentencing, so that was when he put his concerns on record. *Id.*

When questioned about the portion of the trial record where he appears to agree that Ford discussed trial strategy with him, Petitioner said he was agreeing that they had been over trial strategy generally.  However, he said that the trial strategy included calling his alibi witness.  *Id.* at 72.  He said he was not agreeing to any change in strategy; they never discussed a change.  He also said he still thought that Young would be called. *Id.* at 73.  He testified that he "didn't know that the trial had stopped right then and there." *Id.*  He testified he also "didn't know that that time right there was the appropriate time to voice my opinion or you know, say what I had to say." *Id.*

### (3).  Alibi Witness Demetria Young

Young said she independently recalled that she was with Petitioner on January 16, 1999, through the night and much of the next day.  She also remembered that they

had gone to the Zodiac Club on the 16th. *Id.*  However, she did not recall every detail of their time together.  She said it was their habit to go to the Zodiac Club almost every weekend. *Id.*

Young testified that she remembered signing the affidavit. *Id.* at 42.  She said it was several months after Petitioner's conviction. *Id.* at 48.  She could not remember who typed up the affidavit, or who gave it to her to sign. *Id.* at 50.  She also did not remember when it was first presented to her. *Id.* at 50.  Young testified that if she would have been called as a witness at Petitioner's trial, she would have testified consistent with her affidavit. *Id.* at 45.  She said she and Petitioner have not been a couple for a long time. *Id.* at 46.  She came to the evidentiary hearing voluntarily, and was not under subpoena. *Id.*

Young said she spoke with Ford only once.  During that conversation, she told Ford that Petitioner was with her during the time of the murder. She told Ford she was willing to be a witness.  Young said that when she spoke with Ford, Ford was "snappy" with her, had a "very smart attitude," and seemed to think she was lying. *Id.* at 44-45. Young said that Ford never contacted her again, and did not tell her when the trial would take place. *Id.* at 45.

Young said she did not recall Ford's investigator ever calling her. *Id.* at 46. Young said she has had the same telephone number since the1990s, and she always tries to answer her phone because she also uses it as a business line. *Id.* at 45.  She

testified that she did not have her phone shut off, and she was available to anyone who tried to contact her at that number. *Id.* at 78.

Young said she never contacted the police because she spoke to Ford. *Id.* at 47. She said she was unaware of how the court system operated, and never approached the prosecutor. *Id.*

## G.    The Evidentiary Hearing Testimony Shows the Facts Alleged in Support of Petitioner's Claims Are True

The Court finds that the evidentiary hearing testimony shows the facts alleged by Petitioner are true: Ford knew of his alibi witness, yet failed to conduct a reasonable investigation, and had no reasonable basis from which to conclude that further investigation was not necessary. To reach this determination, the Court makes several factual findings based on its observation of the testimony of the witnesses at the evidentiary hearing, and an assessment of their credibility.  The Court considers their credibility in light of the entire record.

First, the Court finds Young's testimony and demeanor credible; she has no stake in the matter, and was not personally involved with Petitioner at the time of the hearing.[5]  Her testimony was consistent, and she testified at the hearing voluntarily. The Court believes her testimony that: (1) she approached Ford about testifying on Petitioner's behalf; (2) she told Ford that Petitioner was with her during the time of the

_____

[5] Although the record is not clear on when Petitioner and Young stopped seeing each other romantically, Petitioner says his relationship with Young was over before he was arrested for this crime.

crime; (3) she would have testified at trial, had she been asked; (4) she would have testified that Petitioner was with her at the time of the murder, consistent with her affidavit; and (5) she could have been reached by phone, had Ford made a serious attempt to contact her.

Second, the Court finds Ford's demeanor and testimony less than credible; her testimony was vague, evasive, contradictory, implausible and self-serving.  Additionally, her hostile demeanor was in stark contrast to the other witnesses.  The Court declines to credit Ford's testimony that: (1) she had an extremely high independent recollection of the case; (2) Petitioner told her different versions of his whereabouts during the time of the murder, or presented "revolving alibis;" and (3) she attempted to contact and further investigate Young or an alibi defense.  The Court believes that Ford spoke with Young on one occasion, and immediately and unreasonably decided that she did not believe Young, so she did not seriously attempt to investigate or contact her after that meeting.

Ford's testimony that she attempted to conduct a thorough investigation of Young, but could not reach her, is undermined by her testimony that, upon first meeting Young, she did not believe her.  Ford testified that she never believed Young, and never intended to use her during trial; therefore, it is implausible that she would continue to investigate Young as an alibi witness.  Furthermore, it is implausible that, had Ford directed an investigator to contact Young, he was unable to do so in the five months

between the calendar conference and the trial.[6]   This is particularly emphasized by the ability of the Petitioner to contact Young ten years later using the same phone number, and convince her to voluntarily come to an evidentiary hearing.

Ford's testimony that her investigator told her he attempted to contact Young is hearsay, and the Court does not find Ford's memory on this issue any better than her memory of the case as a whole.  In fact, Ford first testified that she never even had Young's phone number and address before reviewing a document contradicting this. Ford's inability to contact Young is also implausible because Young voluntarily came forth and spoke with Ford about her interest in testifying as an alibi witness.  The Court believes that Ford did not conduct an investigation of Petitioner's alibi witness after speaking with her in court once.  And, this comports with Young's testimony that neither Ford nor Ford's investigator attempted to contact her.

The Court does not believe that Petitioner presented Ford with more than one alibi defense.  According to Ford's own testimony, she always filed a notice of alibi if one was possible—this is apparently so even if she doesn't believe the alibi witness.  If Ford filed a notice of alibi for Young, even though she didn't believe Young and never intended to call her, it is hard to understand why she would not do the same for the other potential alibi witnesses Petitioner allegedly named.  Based on Ford's poor memory and contradictory testimony, it seems more likely that Ford was simply

---

[6] The calendar conference was on August 25, 2000.  The trial began on January 29, 2001.

confused about the facts (she often confused names, dates, and other important facts during her testimony) and failed to accurately testify to what Petitioner told her.

It appears to this Court that Ford made no reasonable attempt to investigate Young.

Moreover, the testimony shows that Ford had no reasonable basis to make the decision that Young should not be called as a witness.

At the evidentiary hearing, Ford gave three reasons why she decided not to call Young as a witness: (1) Young was not credible; (2) Young would commit perjury; and (3) Young was unavailable.  For the following reasons, as well as Ford's demeanor during the hearing, these reasons are inadequate to justify Ford's strategic decision, where, as here, the jury was not presented with the substance of the witness's exculpatory alibi testimony through the introduction of other competent evidence.

First, Ford said that she did not call Young because Young was incredible. When asked why she decided that Young was incredible, Ford did not remember; however, she said it could have been because Young did not give Ford her address or the exact time Petitioner was with her.  This is not a reasonable justification for Ford's strategic decision not to call Young, because there was no reasonable basis for Ford's decision. Ford spoke with Young only once, at Young's behest, and more than 18 months after the murder occurred.  It would not be uncommon for an individual to need to review records to help recall specifics after such a long period of time.  Additionally, it is clear

from Ford's testimony that she did not remember her one encounter with Young well
enough to remember why she believed Young was incredible.

Second, Ford said her decision not to call Young was based on her belief that
Young would commit perjury.  However, Ford had no basis for this decision because
she did not investigate the alleged alibi.  This justification is also inconsistent with other
portions of Ford's testimony.  For example, Ford said that she did not subpoena Young
because she did not have Young's complete address, not because Young was lying.
Ford indicated that she may have decided Young was lying because Petitioner told her
that he was at Brenda Hill's house which neighbored Richardson's house when the
shooting occurred; yet, in her closing statement to the jury during trial, she argued that
Petitioner was not there during the time of the murder.  Certainly it would have breached
her ethical duties to present this argument had she believed that Petitioner was present
during the shooting.  "While counsel has no duty to knowingly aid a perjurious defense,
there is nothing in the present record to suggest trial counsel had any such knowledge."
*Wilson v. Cowan,* 578 F.2d 166, 168 (6th Cir. 1978).  When she made the decision not
to call Young as a trial witness, Ford had no reasonable basis to believe Young would
fabricate trial testimony.

Third, Ford said Young was unavailable.  However, Young said that she would
have testified at the trial had Ford asked her to do so.  The Court does not believe that
Ford failed to call Young because she was unavailable, particularly in light of the fact
Ford also testified that she believed Young was incredible and lying, and that Ford
would not have put Young on the stand had she been available or shown up at the trial.

Page 47 of  50

The reasons given by Ford are not cogent tactical justifications for deciding not to call Young. Although other reasons may exist that might justify Ford's decision, it is not appropriate for the Court to speculate as to what they might be. "Just as a reviewing court should not second guess the strategic decisions of counsel with the benefit of hindsight, it should also not construct strategic defenses which counsel does not offer." *Caldwell v. Lewis*, 2011 WL 915764 at *7 (6th Cir. 2011) (quoting *David v. Lambert*, 388 F.3d 1052, 1064 (7th Cir. 2004)). Ford's performance in failing to call alibi witness Young was deficient, because it was unreasonable under the circumstances and had no cogent tactical or other justification. *Caldwell*, 2011 WL 915764 at *6 ("An attorney's failure to present available exculpatory evidence is ordinarily deficient, unless some cogent tactical or other consideration justified it.").

The evidence submitted at the hearing confirms the facts that Petitioner alleges, and he is entitled to habeas relief.

**H.     Appellate Counsel's Failure to Raise These Claims on Appeal**

Petitioner says that his appellate counsel was ineffective for failing to raise his trial counsel's ineffectiveness on the grounds discussed above in his appeal to the Michigan Court of Appeals.

While it is true that the issues were not briefed on appeal, these claims were properly raised, explained, and supported in the motion to remand while the appeal was pending. Appellate counsel filed the motion to remand at Petitioner's request. The Court of Appeals reviewed the claims in the motion to remand, and denied relief on the

merits.  Therefore, Petitioner cannot show a reasonable probability that including these claims in his appellate brief would have had any impact on the result of the appeal; he cannot show prejudice.

Petitioner's appellate counsel was not constitutionally ineffective.

**IV.    CONCLUSION**

Petitioner was denied the effective assistance of trial counsel in violation of his Sixth Amendment rights, and the state court's decision to the contrary is an unreasonable application of clearly established Supreme Court precedent.  Accordingly, the Court **CONDITIONALLY GRANTS** the petition for writ of habeas corpus.  The State must either release Petitioner, or institute proceedings to retry him within 90 days of the filing date of this Order.  If the State fails to do so, Petitioner may move for an unconditional writ seeking immediate release from custody.  If the State appeals this Order to the United States Court of Appeals for the Sixth Circuit, this Order is stayed pending disposition of that appeal.

**IT IS ORDERED.**


s/Victoria A. Roberts
Victoria A. Roberts
United States District Judge


Dated:  July 27, 2011

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on July 27, 2011.

s/Carol A. Pinegar

Deputy Clerk